(May 14, 1998)

■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v WILLIAM W. JOHNSON, Appellant. [673 NYS2d 755] —Mikoll, J. P.

Appeal from a judgment of the County Court of Tompkins County (Sherman, J.), rendered April 10, 1995, upon a verdict convicting defendant of the crimes of rape in the second degree (two counts), sodomy in the second degree (two counts) and endangering the welfare of a child.

Defendant, while pastor of the Calvary Baptist Church in the City of Ithaca, Tompkins County, became involved in a sexual relationship with a 13-year-old parishioner. The investigation leading to the prosecution and conviction of defendant was initiated by the victim's mother. The victim's participation in the entire process, from her interview with police to her submission of a letter urging leniency for defendant upon sentencing, was unwilling.

Suspicious about her daughter's increasingly close relationship with defendant, the victim's mother sought pregnancy testing for her daughter and, while awaiting the results thereof, brought her to the Ithaca Police Department to be interviewed concerning her relations with defendant. The victim was not initially told why she was at the police station. The interview lasted between four and five hours, during the first several hours of which the victim denied any sexual relationship with defendant. The police told her they believed she was lying and that she was going to remain there until the truth was revealed, regardless of how long it took. After several hours, the victim's mother, having just learned the results of the pregnancy test, informed the victim that she was pregnant and that defendant must be confronted with this fact. When the victim indicated she wanted to go home, a police officer told her "it's not over yet". At one point, the victim's access to the door of the interview room was blocked by a police officer.

Finally, the victim admitted that she had been involved in a sexual relationship with defendant. She expressed extreme concern about his welfare and asked whether he would be arrested and sent to jail. There is conflicting testimony concerning the extent of representations made to the victim, but it is clear that at least one police officer promised her that he would talk to the Assistant District Attorney to make sure that defendant received counseling. The victim refused repeated requests made by the police and her parents that she telephone defendant and, while police listened, advise him that she was pregnant. The victim persisted in refusing to make the call despite various recriminations and threats by her mother that she would force the victim to have an abortion, have defendant removed as pastor of the church and "splash this all over the

newspaper". She ultimately acquiesced, however, when her mother began to leave the room expressing an immediate intent to go to the church, disrupt its prayer meeting, and expose defendant to the congregation. Two taped telephone conversations between the victim and defendant were received into evidence at the trial. In addition to tacitly acknowledging their sexual relationship, defendant repeatedly implored the victim to protect him by lying about their relationship. While the victim and defendant were still engaged in their telephone conversation, police officers proceeded to the church and arrested defendant. Subsequently, the victim testified against defendant before the Grand Jury. She also testified, under subpoena, as a defense witness during the hearing held upon defense motions to suppress the taped telephone conversations.

At trial, when the People called the victim to the witness stand, she refused to substantively answer any questions, repeatedly responding "I have nothing to say." She indicated that she did not want to be there, and would not explain her refusal to testify other than stating "[b]ecause I choose not to". Upon her refusal to testify, the prosecutor sought to introduce her Grand Jury testimony into evidence as part of its direct case. County Court did not hold a *Sirois/Hellenbrand* hearing on the issue (*see, Matter of Holtzman v Hellenbrand*, 92 AD2d 405), agreeing instead with the prosecution that such a hearing was unnecessary because sufficient evidence was already before the court; the court concluded that the victim's refusal to testify was induced by defendant. The victim's Grand Jury testimony was read to the jury during the prosecution's direct case, and reread to them during deliberations in response to their request.

We cannot let this conviction stand, resting as it does principally on crucial testimony which was improperly admitted. We can discern no clearer requirements in the cases which have visited the issue than that a hearing is absolutely required as a condition precedent to the admission of Grand Jury testimony, and that at such a hearing the prosecution must establish defendant's responsibility for a witness's refusal to testify by clear and convincing evidence of his misconduct.

The seminal case of *Matter of Holtzman v Hellenbrand* (92 AD2d 405, *supra*) sets forth the three-part rule that:

"(1) whenever the People allege specific facts which demonstrate a 'distinct possibility' * * * that a criminal defendant's misconduct has induced a witness' unlawful refusal to testify at trial or has caused the witness' disappearance or demise, the People shall be given the opportunity to prove that misconduct at an evidentiary hearing;

"(2) at said hearing the burden shall be upon the People to prove defendant's misconduct by clear and convincing evidence * * * and

"(3) upon an affirmative finding by the court on the issue of defendant's misconduct, the defendant will be deemed to have waived any objection to the admissibility of the witness' prior Grand Jury testimony and said testimony may be admitted as direct evidence at the defendant's trial" (*id.*, at 415 [citations omitted]).

Not surprisingly, reported cases in which *Sirois/Hellenbrand* hearings were sought by the prosecution based upon the unavailability of witnesses have as their common denominator threats, fear or intimidation, directly or indirectly attributable to a defendant (*see, e.g., People v Delarosa*, 218 AD2d 667 [witness feared for safety]; *People v Tuzzio*, 201 AD2d 595, *lv denied* 83 NY2d 877 [fear of defendant and/or his family]; *People v Small*, 177 AD2d 669, *lv denied* 79 NY2d 953 [witness afraid of defendant and feared for his safety if he testified]; *People v Cotto*, 169 Misc 2d 194 [witness threatened]).

Not until *People v Geraci* (85 NY2d 359), however, did the Court of Appeals explicitly consider and confirm the appropriate standard of proof required as a foundation for the admission of such testimony. Noting that receipt of such testimony as an exception to the hearsay rule "is justified not by the inherent reliability of the evidence * * * but rather by the public policy of reducing the incentive to tamper with witnesses" (*id.*, at 367-368 [citations omitted]). The Court rejected application of the preponderance of the evidence standard, requiring instead "*a standard of proof that is high enough to assure a great degree of accuracy in the determination of whether the defendant was, in fact, involved in procuring the witness's unavailability for live testimony*" (*id.*, at 368 [emphasis supplied]). Further, the Court held that "such use should be authorized *only to the extent that the misconduct is clearly and convincingly shown*" (*id.*, at 368 [emphasis supplied]). Especially in light of the statutory prohibition against the use of Grand Jury testimony, the Court of Appeals noted that "*our statutory and decisional law counsels a cautious approach that permits use of the exception only when the predicate facts are proven with the degree of certainty that the 'clear and convincing evidence' test assures*" (*id.*, at 368-369 [emphasis supplied]). In determining that the requisite standard had been satisfied in the case before it, the Court noted specifically that in numerous meetings with police before the refusal to testify, the witness in question "had never voiced any reluctance to testify" (*id.*, at 363).

In *People v Hamilton* (127 AD2d 691, *affd* 70 NY2d 987), the trial court admitted Grand Jury testimony of a witness who testified at the *Sirois/Hellenbrand* hearing that neither the defendant nor his family threatened her or asked her not to testify; instead, she indicated that the police had coerced her to testify falsely before the Grand Jury. Her testimony was contradicted by police testimony denying any coercion. An Assistant District Attorney testified that the witness told him that while she feared difficulties with defendant and his family, there had been no threats. Reversing the conviction, the Second Department found that the hearing court's determination "is not supported by the evidence, but *rests solely upon speculation and conjecture which, at best, may rise to the level of suspicion as to the defendant's involvement in [the witness's] refusal to testify. * * * [S]uspicion does not constitute the clear and convincing evidence which is necessary in order to find a waiver by the defendant of his right to confrontation"* (*id.*, at 692-693 [emphasis supplied]). In affirming the Court of Appeals noted the absence of any evidence that the defendant had threatened the witness (*People v Hamilton*, 70 NY2d 987, 988).

The People assert on this appeal that they "proved by clear and convincing evidence that defendant, a 52-year-old Christian minister, procured the victim's unavailability to testify at trial by dominating her life and influencing her decisions". They cite, as examples of this evidence, (1) the fact that the relationship between the victim and defendant and their families, with its origins in their common church, gradually escalated into one wherein defendant assumed the role of surrogate father, (2) the letters admitted into evidence demonstrating the victim's "obsessive craving" for defendant's presence and approval, and (3) the taped telephone conversations wherein defendant urged the victim to protect him by lying about their relationship. Also advanced as evidence of defendant's responsibility for the victim's refusal to testify is a letter written by the victim to defendant which was apparently undelivered since the original was found by the victim's mother. In the letter, which County Court did not receive into evidence at trial but considered for purposes of the application to admit the victim's Grand Jury testimony,[1] the victim continues to profess her love for defendant and questions him

---

1. Despite declining to hold a *Sirois/Hellenbrand* hearing, County Court unilaterally received and considered evidence, in the form of the letter, from which it drew inferences that the victim was "contacted by the defendant or on behalf of the defendant" relative to the manner in which she should re-

as to how to respond to questions posed at trial by his counsel. In its written decision permitting the use of the victim's Grand Jury testimony, County Court cited much of the same evidence relied upon by the People herein and concluded that "the victim is refusing to testify at this point simply to protect the defendant".

While we fault County Court in the first instance for failing to hold the required hearing, thereby avoiding the fact-based inquiry mandated by *People v Geraci* (85 NY2d 359, *supra*), we similarly disagree with its determination following the flawed procedure. Ignored by the court was the fact that all of the considerations it cited as supporting its conclusion that defendant induced the victim not to testify prevailed at the very time she was first produced at the police station for the interview, as well as at the time of her Grand Jury and suppression hearing testimony.[2] Her unwillingness to cooperate, indeed her untruthfulness about their relationship, her concern for his welfare and wish that he not go to jail, *antedated defendant's very knowledge of the investigation.*

As noted earlier, the victim's participation in the prosecution of defendant was, from beginning to end, unwilling. At sentencing, she submitted a letter to County Court decrying her characterization as a "victim" in the prosecution, and contending instead that it more befitted her status as a result of the prosecution itself. It is unclear (and ultimately irrelevant) how defendant's role changed from that of close family friend/pastor to paramour. Whether he deliberately exploited the victim's vulnerability and juvenile infatuation to insinuate himself into a sexual relationship with her or whether he succumbed to the temptations of the situation is of little import. In either case, his actions were reprehensible. Moreover, we acknowledge that in a very real, albeit global sense, the victim's unwillingness to cooperate is a direct consequence of, or at least inextricably connected with, the misconduct of which defendant stands convicted. We are constrained, however, by the fact that we sit not in moral, but legal judgment. However despicable defen-

spond to questions at trial, and upon which inferences its decision to admit the testimony partially rested. It is elementary that one of the functions of a hearing in such situations is to afford all parties an opportunity to develop the full factual basis upon which any inferences might be drawn.

**2.** Although the victim testified under subpoena as a defense witness at the suppression hearing, specifically as to the duress employed to obtain her consent to the taping of the telephone conversations, she acknowledged on cross-examination that she had a sexual relationship with defendant, that she initially lied about it to police and that she wanted to protect him and make sure he did not go to jail.

dant's conduct, however tragic its consequences, the legal process to which he is subject must maintain its own integrity. Were our task simply to determine whether in a particular case the end justifies the means, we could dispense with a major portion of our accumulated body of jurisprudence. Notwithstanding the many instances where our laws substantively reflect codified morality, we cannot extend the phenomenon to include matters of procedure, particularly those with constitutional implications; our system would then become another casualty of a case already replete with them.

Having identified the principal error upon which we base our reversal, we briefly address the People's argument that any error should be considered harmless in view of the totality of the evidence. Without reaching the question whether an error of this magnitude could be considered harmless in any circumstances, we find that it was hardly so herein. Aside from the victim's testimony (which the jury requested reread to them), the principal incriminating evidence against defendant consisted of the telephone conversations, whose sufficiency standing alone we decline to evaluate except as is implicit in our harmless error determination.

Since there must be a new trial, we briefly address two evidentiary points raised on this appeal: the admission of the taped telephone conversations and certain writings between the victim and defendant.

Our recitation of the facts leading up to the victim's participation in taped telephone conversations with defendant illustrates the less than auspicious circumstances surrounding her agreement to make the calls and her consent to their taping. We agree with County Court, however, that to the extent undue pressure was brought to bear on the victim to obtain her consent, it was exerted by her mother and not by the police. Given this fact, as well as the consent given by her mother, we find no legal basis upon which the evidence should have been excluded. We also note that the court correctly distinguished between the constitutional protections to be afforded a prospective defendant and the victim of a crime.

As to the admission of certain letters written by the victim to defendant and a tablet on which the victim's mother testified that she observed defendant and the victim passing notes, we conclude that County Court erred in permitting these items into evidence. Initially, we note that as to the letters written by the victim, there was no testimony to the effect that defen-

dant ever received any of these letters.[3] Moreover, although the court's ruling was initially limited to admitting these documents not for their content, but to explain the actions of the victim's mother, including enlisting the involvement of the police, the court subsequently retreated from this limitation. Given their marginal relevance, weak probative value and significant prejudicial effect, the documents should have been excluded.

We reject the balance of defendant's contentions on appeal as being either without merit or rendered academic by our decision.

Yesawich Jr., J., concurs.

Spain, J. (concurring). I do not subscribe to the dissent's position that defense counsel waived defendant's right to a *Sirois/Hellenbrand* hearing. I agree with the majority that County Court erred in acceding to the People's insistence that a *Sirois/Hellenbrand* hearing was not necessary (*see, Matter of Holtzman v Hellenbrand*, 92 AD2d 405). In my view, at the time of its decision, County Court merely had before it evidence which demonstrated "a distinct possibility that the defendant participated in making the witness unavailable" (*id.*, at 411). Notably, a key piece of evidence relied upon by County Court was a letter (People's exhibit No. 6) which was not allowed in evidence at the trial.

Defendant is entitled to a full evidentiary hearing at which the People must meet their burden of establishing by clear and convincing evidence that the victim's refusal to testify at the trial was induced by defendant's misconduct (*see, People v Geraci*, 85 NY2d 359, 365-367; *People v Hamilton*, 127 AD2d 691, *affd* 70 NY2d 987). Accordingly, I vote to reverse defendant's conviction and order a new trial, solely on the failure of County Court to hold a *Sirois/Hellenbrand* hearing.

Peters, J. (dissenting). We are convinced that County Court scrupulously adhered to the strictures of *Matter of Holtzman v Hellenbrand* (92 AD2d 405) and properly admitted the victim's prior Grand Jury testimony into evidence on the People's direct case.

In support of its application, the People submitted, *inter alia*, a memo of law and transcripts of telephone conversations between the victim and defendant, advising that they believed

---

**3.** Since the victim refused to testify, the only foundation for the admission of these letters was the testimony of the victim's mother to the effect that she found them in her daughter's room and that they bore her handwriting.

that their proffer precluded the need for a hearing. Should the court disagree, they maintained that they were prepared to proceed. Defense counsel neither objected nor argued that a hearing was necessary, rather stating that he was "prepared to go forward * * * at this point in time". Thereafter, in direct response to a question from County Court, the People again advised that they had no need for a hearing since they had no further evidentiary proof, prompting counsel for defendant to orally argue the motion. Again, he never requested an opportunity to examine witnesses or demanded that a hearing be conducted. He contended that since the taped conversations in which defendant had importuned the victim to lie or to remain silent in order to keep him out of jail had taken place prior to the victim's testimony before the Grand Jury and no additional evidence of influence subsequent to her Grand Jury testimony was propounded, the People failed to meet their burden of proof. The People reminded the court that the witness "remains in love with the [d]efendant", and that when she testified for the People before the Grand Jury and for the defense at the suppression hearing the consequences of her testimony were not as apparent as at trial, nor was she affected by the physical presence of defendant and a jury. Counsel for defendant contended, in response, that pursuant to *People v Pappalardo* (152 Misc 2d 364, 371), a close relationship, standing alone, remains insufficient to show an unlawful involvement in the witness's refusal to testify. County Court then advised that it would take a lunch hour recess before rendering a decision. Upon reconvening, the court found that the People had met their burden of proof and that it would admit the victim's Grand Jury testimony. It was not until that time that defense counsel announced his "entitle[ment] to a hearing".

Viewing these facts in their totality, we are of the opinion that defense counsel acquiesced in proceeding without a hearing and that his subsequent request, postdecision, was untimely. Under these circumstances, County Court was not required to *sua sponte* hold such a hearing.

We further find that County Court properly concluded that the People established, by clear and convincing evidence, that defendant induced the victim's refusal to testify. We are unpersuaded by the majority's reliance upon the fact that the victim demonstrated an unwillingness to cooperate with law enforcement authorities even before defendant gained knowledge of an actual criminal investigation and that there was no proof of any affirmative conduct by defendant thereafter to prevail upon the victim not to testify at trial. There is no requirement that

the offending conduct occur in close proximity to the refusal of a witness to testify or that force or threats are a prerequisite to a finding of wrongful conduct on the part of a defendant (*see, Matter of Holtzman v Hellenbrand, supra,* at 415; *People v Pappalardo, supra,* at 371).

Borne of the conduct of the type seen here, procurement waivers become necessary to sustain " 'the very system of justice the confrontation clause was designed to protect' " (Markland, *The Admission of Hearsay Evidence Where Defendant Misconduct Causes the Unavailability of a Prosecution Witness,* 43 Am U L Rev 995, 1005 [1994], quoting *United States v Mastrangelo,* 693 F2d 269, 273). Using his unique position of authority as pastor of the family's church and the provider of pastoral/counseling services to this child, defendant took advantage of an emotionally fragmented family and became the dominant figure in this child's life, even to the extent that she called him "daddy". Upon his elevation to the status of surrogate father and religious icon, he then engaged in sexual relations with this child when she was just 12 years of age. After the victim's mother discovered the relationship and determined that the victim was pregnant, defendant continued to demonstrate an unwillingness to admit his conduct and, instead, urged the victim to lie for him and protect him from jail, even blaming her for his downfall.

Taken together, defendant's admissions, the victim's testimony and the testimony of the victim's mother establish the relationship between the victim and defendant to be one in which defendant, acting as religious adviser, surrogate father and sexual partner, totally controlled this child's life. His admonishment to her, that only her words could send him to jail, silenced this child as surely as if he had cut off her tongue. "In short, the cumulative evidence and the inferences that logically flow therefrom were sufficient to support a determination by a rational fact finder, under the clear and convincing evidence standard, that defendant either was responsible for or had acquiesced in the conduct that rendered [this child] unavailable for trial" (*People v Geraci,* 85 NY2d 359, 370).

Since we can think of no more compelling factual circumstances to invoke this exception to the hearsay rule, we would affirm the judgment of conviction.

Carpinello, J., concurs. Ordered that the judgment is reversed, on the law, and matter remitted to the County Court of Tompkins County for a new trial.