OPINION OF THE COURT
Caesar Cirigliano, J.
Joseph Pappalardo is charged with murder in the second degree for the shooting death of Vincent Guarna on June 15, 1989. Iris Lerman, the sole eyewitness to this homicide, is an indispensable witness for the People. Iris Lerman gave a *365 detailed account of the shooting to a detective on the day of the homicide and testified fully before the Grand Jury. Now, nearly two years later, Lerman claims that she is suffering from amnesia and cannot remember what happened on the day of the homicide. She cannot remember giving statements to the authorities. Her memory is otherwise intact.
The People seek to introduce Iris Lerman’s Grand Jury testimony on their direct case at trial and may do so providing they are able to clearly and convincingly establish that the witness is unavailable in that she is unlawfully refusing to testify and that the defendant is involved in procuring the witness’ unavailability. (See, Matter of Holtzman v Hellenbrand, 92 AD2d 405 [2d Dept 1983].)
The use of a witness’ Grand Jury testimony under the guidelines established in Hellenbrand (supra) is not new. However, the witness’ claim of amnesia raises a question that has not yet been decided by the courts of the State: Does amnesia render a witness unavailable, thus satisfying the prerequisite for the use of hearsay in the form of the witness’ Grand Jury testimony?
A showing that this witness is unavailable is an absolute prerequisite for the admission of her Grand Jury testimony. The use of this hearsay evidence, like the use of other forms of hearsay such as former testimony, dying declarations, and declarations against interest, is premised upon the fact that the evidence is necessary for a proper resolution of the matter, but the testimony of the witness cannot be procured. (See, e.g., People v Settles, 46 NY2d 154, 166-167 [1978]; see also, Richardson, Evidence § 258, at 113-114 [Prince 10th ed, 1972-1985 Cum Supp]; McCormick, Evidence § 253, at 753 [3d ed 1984].)
Although Federal courts applying the Federal Rules of Evidence and State courts in other jurisdictions have held that amnesia satisfies the requirement of unavailability, I have found no New York cases that have considered and decided this question. (See, Fed Rules Evid, rule 804 [a] [3]; United States v Garris, 616 F2d 626 [2d Cir 1980], cert denied 447 US 926; United States v Palumbo, 639 F2d 123 [3d Cir 1981], cert denied 454 US 819; Commonwealth v Graves, 484 Pa 29, 398 A2d 644 [1979]; Commonwealth v Jones, 344 Pa Super 420, 496 A2d 1177 [1985]; State v Young, 20 Ohio App 3d 269, 485 NE2d 814 [1984].)
In New York, the cases have traditionally listed "death, *366 absence from the jurisdiction, and invocation of privilege as establishing unavailability, see, e.g., People v. Shortridge, 65 N.Y.2d 309, 313, 491 N.Y.S.2d 298, 480 N.E.2d 1080 (1985).” (Richardson, Evidence, op. cit., at 113.) However, commentators have suggested that other factors creating " 'practical unavailability’ ” should also be able to satisfy the unavailability requirement. (Id; see also, Fisch, New York Evidence § 893, at 521 [2d ed 1977].)
The Second Department has recently endorsed this view, finding that other factors do create "practical unavailability” and holding that this determination should be made on a case-by-case basis. (People v Carpenito, 171 AD2d 45 [2d Dept].)
In this case, Iris Lerman has adamantly and repeatedly insisted that she is unable to recall the events surrounding this homicide. She has maintained this position though threatened with contempt and imprisonment. She reiterated her claim of amnesia even after being offered the inducement of complete immunity from prosecution.
My assessment of this witness, who testified at this hearing on a number of occasions, is that she will not, under any circumstances, retreat from her claim of amnesia and will not allow her testimony to be taken. I therefore find that the People have established that the testimony of this witness is unavailable.
However, this finding does not end the inquiry. Under the guidelines formulated in Hellenbrand (supra) where, as here, a witness is present in the jurisdiction and amenable to court process, the People must do more than merely show that the witness’ testimony is unavailable. The People must show that the witness’ refusal to testify is unlawful. (Matter of Holtzman v Hellenbrand, supra, 92 AD2d, at 414.)
A refusal to testify based upon a claim of amnesia is unlawful only if the amnesia is feigned. (See, e.g., Matter of Second Additional Grand Jury v Cirillo, 12 NY2d 206 [1963] [feigned loss of memory constitutes a wrongful refusal to testify]; People v Schenkman, 46 NY2d 232, 237 [1978] [a witness who feigns memory loss in order to avoid giving testimony is guilty of criminal contempt].)
Accordingly, the People must, as a threshold matter, demonstrate that Iris Lerman is feigning memory loss. If the People are then able to show that the defendant is involved in this unlawful refusal to testify through " 'knowledge, complicity, planning or in any other way’ ” (Matter of Holtzman v *367 Hellenbrand, supra, 92 AD2d, at 414), the witness’ Grand Jury testimony is admissible because the defendant, by his wrongful conduct, is deemed to have waived his right to confront this witness and to object to the hearsay nature of this testimony. (Supra; see also, United States v Mastrangelo, 693 F2d 269 [2d Cir 1982], 722 F2d 13, cert denied 467 US 1204; Steele v Taylor, 684 F2d 1193 [6th Cir 1982], cert denied 460 US 1053, reh denied sub nom. Kilbane v Marshall, 461 US 940.)
Findings and Conclusions as to the Witness’ ’’Amnesia”
I conducted a lengthy hearing in this matter.* Based upon all of the credible evidence adduced at this hearing, I find that Iris Lerman’s professed amnesia is nothing other than a subterfuge she is employing in order to avoid testifying in this case. Several factors strongly support this conclusion.
Most significant is the fact that this witness did not reveal her condition until she was compelled to appear and testify at this hearing. This is a witness who cooperated fully with the prosecution at the commencement of this investigation; gave lengthy, detailed statements to the police, the Grand Jury and the court; maintained a close relationship to the assistant assigned to prosecute the case, confided her fears to the Assistant District Attorney and sought her help in insuring that the defendant would not harm her.
Under these circumstances, it is inconceivable to this court that a genuine loss of memory would not have been divulged immediately to the Assistant District Attorney and the court. Instead, with the defendant’s assistance, she retained an attorney and effectively shielded herself from having to discuss this case with the prosecution.
Lerman then consulted with a psychiatrist in an effort to give her claim of amnesia a plausibility that it otherwise lacked. Indeed, her attorney requested a letter from the psychiatrist in an effort to document her treatment.
It is very clear to this court, however, that Iris Lerman did not seek the advice of a psychiatrist for the purpose of being treated. She did not pursue the course of treatment recommended by the doctor and saw him only at her convenience *368 when it seemed necessary to give the impression that she was continuing treatment. Indeed, she visited the doctor for the first time in seven months shortly after this court announced that it would receive additional evidence concerning her unlawful refusal to testify.
The very selective nature of this witness’ amnesia provides further evidence that her amnesia is feigned. This court finds it most incredible that this witness was able to give detailed statements about this homicide in the immediate aftermath of this traumatic event and at a time when she professed to be in fear of the defendant and yet was unable to recall the events of this case and only those events that relate to this case, long after the fear and trauma had undoubtedly been dissipated by the passage of time and her renewed relationship with the defendant.
Moreover, I have had an extensive opportunity to observe this witness. I observed her demeanor very closely and listened to her testimony very carefully. Her testimony as to her "amnesia” simply did not ring true. It was hollow, wooden and very obviously rehearsed.
In sum, whether I consider the psychiatrist’s testimony, the differential diagnosis contained in the psychiatric literature, or a plain commonsense evaluation of the witnesses and the evidence, the conclusion is inescapable that this witness is feigning memory loss.
Accordingly, I hold that the People have clearly and convincingly established that this witness is feigning memory loss and is thereby unlawfully refusing to testify.
Findings and Conclusions as to The Defendant’s Wrongdoing
The sole remaining question is whether the proof adduced at the hearing clearly and convincingly establishes that this defendant was involved in the witness’ unlawful refusal to testify through " 'knowledge, complicity, planning or in any other way’ ” (Matter of Holtzman v Hellenbrand, supra, 92 AD2d, at 414), and has thereby waived his right to confront this witness and has waived any objections he may have to the hearsay nature of her Grand Jury testimony.
The law tolerates the admission of such unconfronted testimony and implies a waiver of these rights upon the principle that a defendant should not be permitted to profit by his wrongful acts. The Supreme Court long ago recognized that *369 while "[t]he Constitution gives the accused the right to a trial at which he should be confronted with the witnesses against him * * * if a witness is absent by his own wrongful procurement, he cannot complain if competent evidence is admitted to supply the place of that which he has kept away. The Constitution does not guarantee an accused person against the legitimate consequences of his own wrongful acts. It grants him the privilege of being confronted with the witnesses against him; but if he voluntarily keeps the witnesses away, he cannot insist on his privilege.” (Reynolds v United States, 98 US 145, 158 [1878].)
The decisive factor in this analysis is the defendant’s voluntary involvement in procuring the witness’ silence. As the cases in this area demonstrate, the specific method used by a defendant to keep a witness from testifying is not determinative.
In one case, a defendant’s wrongful involvement in a witness’ unlawful refusal to testify consisted of the defendant’s use of his influence over a witness to persuade the witness to refuse to testify and was evidenced, in part, by the fact that the defendant’s attorney represented the witness during some of the proceedings and by the fact that the defendant procured counsel for the witness. (Steele v Taylor, supra, 684 F2d, at 1201.) In another case, the defendant’s wrongful involvement in the witness’ absence consisted of his refusal to reveal the whereabouts of the witness to a process server. (Reynolds v United States, 98 US 145, supra; see also, cases collected in Steele v Taylor, supra, 684 F2d, at 1201, n 10.) Thus, a defendant’s use of force or threats to keep a witness away is not the sole basis for a finding of wrongful conduct on the part of a defendant. (Supra.)
Here, the evidence clearly and convincingly demonstrates that the defendant and this witness decided that this witness was not going to testify and contrived a plan to prevent the taking of her testimony. The defendant financed, supported and was actively involved in implementing this plan.
The existence of this joint plan was compellingly demonstrated. The defendant and Iris Lerman were in frequent communication with one another after they resumed their relationship sometime in August of 1989. In October or November of 1989, Iris, Lerman told her sister-in-law that she was going to see an attorney so that she would not have to testify in this case and that the defendant was paying $4,000 *370 for the lawyer. On November 20, 1989, the defendant drew a $5,000 check to himself and cashed that check. By letter dated November 20, 1989, John M. Murphy, Esq. notified the prosecution that he represented Iris Lerman.
However, before Mr. Murphy’s letter was delivered to the prosecutor, counsel for the defendant informed the court and the prosecutor that Lerman had retained an attorney and would be invoking her Fifth Amendment rights. Counsel could have known of this development in the case only through his client and only because of the defendant’s relationship with Iris Lerman. The defendant’s ongoing involvement in this plan is further evidenced by the fact that the number and length of the calls between Lerman’s telephone and the defendant’s telephone increased before and on the dates of court appearances.
The defendant’s efforts to prevent the taking of this witness’ testimony were also evidenced by the fact that the defendant, in addition to retaining an attorney for this witness, shared his own attorney with her. On a number of occasions during the pendency of this case, counsel for the defendant took up the gauntlet for the witness and argued that the witness would, in fact, be entitled to invoke the Fifth Amendment notwithstanding the fact that the witness had received transactional immunity for her Grand Jury testimony.
During the course of the Hellenbrand hearing, counsel for the defendant made many arguments in support of the witness’ position with his client’s apparent encouragement and approval. Indeed, on a number of occasions, Ms. Lerman’s attorney, Mr. Murphy, had to remind counsel that he did not represent the witness.
Further, the evidence shows that Lerman was referred to the psychiatrist she consulted in order to document her "amnesia,” not by her regular physician, but by a dermatologist, who was an acquaintance of the defendant’s. The attorneys who have brought a proceeding on behalf of the witness to stay a contempt adjudication had also represented the defendant.
Moreover, it would be unrealistic to ignore the undisputed evidence of the close personal relationship between the witness and the defendant. Indeed, Ms. Lerman herself testified to the trips she and the defendant took to Nevada and to Atlantic City. She readily acknowledged speaking with him on the telephone almost daily and seeing him on a frequent basis.
*371 While a close personal relationship between two individuals, standing alone, would not suffice to establish an unlawful involvement in a witness’ refusal to testify, this evidence, when viewed together with all of the other evidence adduced at the hearing, lends additional weight to the conclusion that the defendant and this witness were involved in planning and preparing strategies to enable her to avoid testifying against him at his trial for murder.
In sum, the evidence adduced at this hearing is both clear and convincing, and I have no serious or substantial doubt that the witness is feigning memory loss and that the defendant was and is extensively involved through knowledge complicity and planning in the witness’ unlawful refusal to testify. Indeed, based upon all of the evidence adduced at this hearing and upon my observations of Ms. Lerman, I do not believe that Ms. Lerman would have been capable of implementing the decision that she refuse to testify without the defendant’s financial assistance, emotional support and advice.
Accordingly, I hold that the defendant has waived his right to confront this witness and to object to the hearsay nature of her Grand Jury testimony. The People’s application to introduce Iris Lerman’s Grand Jury testimony upon their direct case at trial is granted.

 The original decision rendered in this matter included an extended factual exposition which has been omitted here for the purposes of publication.