STATE of Iowa, Appellee,

v.

Matthew Scott HALLUM, Appellant.

No. 97–370.

Supreme Court of Iowa.

Feb. 16, 2000.

Linda Del Gallo, State Appellate Defender, and John P. Messina, Assistant State Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, Julie H. Brown, Assistant Attorney General, Thomas S. Mullin, County Attorney, and Mark A. Campbell, Assistant County Attorney, for appellee.

TERNUS, Justice.

Defendant, Matthew Hallum, appealed his criminal convictions claiming error in the admission of his accomplice's video-taped, narrative statement. When his appeal was first before this court, we affirmed, concluding that the admission of the statement violated neither the ban on hearsay evidence nor the defendant's rights under the Confrontation Clause. *State v. Hallum,* 585 N.W.2d 249, 252 (Iowa 1998). Our decision was subsequently vacated by the United States Supreme Court, and the case was remanded to us for further consideration in light of *Lilly v. Virginia,* 527 U.S. 116, 119 S.Ct. 1887, 144 L.Ed.2d 117 (1999). *Hallum v. State,* — U.S. —, 119 S.Ct. 2335, 144 L.Ed.2d 233 (1999). Upon consideration of

the parties' arguments, we find that the defendant forfeited his right to object to the admission of the statement in question because he procured the witness's unavailability at trial. Therefore, we affirm the defendant's convictions.

## I. *Factual and Procedural Background.*

The defendant was convicted of first-degree murder, *see* Iowa Code §§ 707.1, .2, first-degree sexual assault, *see id.* §§ 709.1, .2, and assault with intent to commit serious injury, *see id.* §§ 708.1, .2. Our first opinion contains a review of the events leading to these convictions. *See Hallum,* 585 N.W.2d at 252–53. We will avoid repeating that discussion here except to the extent necessary to understand the issue that we decide today.

The defendant's convictions arose from the sexual assault and murder of Tanya Rubottom. The defendant admitted in his testimony at trial that he and his half-brother, Carlos Medina, had been at the apartment where Rubottom was murdered on the night of her death. He claimed, however, that she was alive when he and Medina left.

Medina, who was a minor and fifteen years younger than the defendant, gave a contrary rendition of these events in a videotaped interview conducted by law enforcement officials within a day after the murder. He told the authorities that he and the defendant sexually assaulted Rubottom and then strangled her. Later, while juvenile proceedings against Medina were still pending, Medina refused to give a deposition in the defendant's case, invoking his Fifth Amendment privilege against self-incrimination. Shortly thereafter, Medina was adjudged guilty of two counts of assault causing bodily injury and received a suspended two-year sentence. Although he was then granted immunity as to the events surrounding Rubottom's death, he persisted in his refusal to testify in the defendant's case. The district court held Medina in contempt and confined him in the county jail pending his cooperation.

In response to the State's indication that it would seek to introduce Medina's statement if Medina continued to refuse to testify, the defendant sought a pretrial ruling that Medina's statement was inadmissible. He supported his motion with an affidavit from Medina in which Medina recanted his videotaped statement and said he was lying when he gave it. The defendant claimed that admission of Medina's prior statement would violate his right of confrontation as well as the hearsay rule. *See* U.S. Const. amend. VI; Iowa R. Evid. 802. The State resisted, asserting that much of Medina's statement was against his penal interest and therefore fell within the statement-against-interest exception to the hearsay rule. *See* Iowa R. Evid. 804(b)(3). The State argued that the remaining portions of Medina's statement had sufficient guarantees of trustworthiness to support their admission under the residual exception to the hearsay rule. *See* Iowa R. Evid. 803(24). The district court, Judge Dewie J. Gaul, ruled that "appropriate portions" of Medina's statement were admissible at trial, assuming his continued unavailability, under the statement-against-interest exception.

The State thereupon filed a motion seeking a ruling that Medina's entire statement was admissible. The State asserted that the defendant had procured Medina's unavailability by encouraging Medina not to testify and, therefore, the defendant could not rely upon the hearsay rule and the Confrontation Clause to prevent admission of Medina's statement. The State supported its argument with correspondence between the defendant and Medina. The specific content of this correspondence will be discussed in more detail below.

The court held an evidentiary hearing on the State's motion. Medina testified at this hearing that he would continue his refusal to testify and that this refusal was totally his own decision. He denied that the defendant had pressured him or

threatened him in any way. He also said that he would refuse to testify even if the defendant wanted him to testify.

The district court, Judge Phillip S. Dandos, ruled that the defendant had procured the unavailability of his brother, rendering Medina's statement admissible over the defendant's hearsay and confrontation objections. Accordingly, Medina's statement was admitted at trial, and the defendant was convicted.

When this court initially considered the defendant's appeal, we addressed the merits of the defendant's hearsay and confrontation objections and did not consider whether the defendant had forfeited his right to raise these objections by improperly influencing his brother not to testify. We held there was no merit to the defendant's objections and affirmed his convictions. *Hallum*, 585 N.W.2d at 252. The United States Supreme Court granted the defendant's petition for writ of certiorari, vacated the judgment, and, as noted earlier, remanded the case to this court for further consideration. *Hallum*, —— U.S. at ——, 119 S.Ct. at 2335, 144 L.Ed.2d at 233. The State's primary argument on remand is that the defendant forfeited his right to object to the admission of his brother's statement. The State contends the defendant's convictions should be affirmed on this basis. We now proceed to address the forfeiture issue.

II. *Scope of Review.*

Because the defendant's alleged forfeiture involves a loss of the constitutional right to confront his accusers, our review is de novo. *Cf. State v. Yaw*, 398 N.W.2d 803, 805–06 (Iowa 1987) (reviewing de novo whether trial counsel rendered ineffective assistance by stipulating to admission of deposition "without first obtaining a valid waiver of [the defendant's] right to confront witnesses against him"); *State v. Reid*, 394 N.W.2d 399, 402 (Iowa 1986) (reviewing claimed waiver of constitutional right to not incriminate oneself de novo). In such a review, "[w]e independently eval-

uate the totality of the circumstances as evidenced by the whole record." *State v. Fox*, 491 N.W.2d 527, 530 (Iowa 1992). Notwithstanding the fact that our review is de novo, we give weight to the district court's findings of fact because that court had the opportunity to personally assess the credibility of the witnesses. *See State v. Morgan*, 559 N.W.2d 603, 608 (Iowa 1997); *State v. Liggins*, 524 N.W.2d 181, 186 (Iowa 1994).

III. *Did the Defendant Forfeit His Right to Object to the Admission of Medina's Videotaped Statement?*

A. *Waiver versus forfeiture.* Initially, we think it essential to identify the appropriate theory under which to analyze the State's argument that the defendant's actions in allegedly procuring Medina's unavailability prevented him from objecting to admission of Medina's statement. Ascertaining the appropriate theory is important because the applicable theory will determine the test to be applied and will provide a framework for our analysis.

The parties have discussed this issue in terms of the defendant's *waiver* of his rights. The use of this terminology finds some support in the case law. *See, e.g., United States v. Balano*, 618 F.2d 624, 626 (10th Cir.1979) (holding that defendant had waived his confrontation rights when his threats to witness caused witness not to testify); *People v. Pappalardo*, 152 Misc.2d 364, 576 N.Y.S.2d 1001, 1003 (Sup. Ct.1991) (holding that defendant who has participated in witness's feigned amnesia "is deemed to have waived his right to confront [the] witness"). We think, however, that the analytical framework employed by the courts, as well as the philosophical basis underlying the loss of the defendant's right to object, are more compatible with a forfeiture theory.

A waiver is an intentional relinquishment of a known right. *See State v. Seager*, 571 N.W.2d 204, 209 (Iowa 1997).

A forfeiture, on the other hand, is the loss of a right as a result of misconduct. *See United States v. Goldberg,* 67 F.3d 1092, 1100 (3d Cir.1995) (distinguishing "waiver" from "forfeiture" and defining "forfeiture" as "the loss of a right regardless of the defendant's knowledge thereof and irrespective of whether the defendant intended to relinquish the right"); S*tate v. Cowen,* 231 Iowa 1117, 1122–23, 3 N.W.2d 176, 179–80 (1942) (defining "forfeit" and "forfeiture" as a loss or penalty); *Webster's Third New International Dictionary* 891 (unabr. ed.1993) (defining "forfeit" as "to lose or lose the right to by some error, fault, offense, or crime" and defining "forfeiture" as "loss of some right, privilege, estate, honor, office, or effects in consequence of a crime, offense, breach of condition, or other act" and "the loss of something through one's own act"). As a review of the case law shows, the focus of the courts holding that a defendant has lost his right to object to the admission of an out-of-court statement falls more clearly within the common definition of a forfeiture.

The United States Supreme Court first recognized that a defendant could lose his right to object to secondary evidence of a witness's testimony in *Reynolds v. United States,* 98 U.S. 145, 158–59, 25 L.Ed. 244, 247–48 (1878). In that case, the defendant was charged with bigamy. *Reynolds,* 98 U.S. at 146, 25 L.Ed. at 245. When the prosecution sought to subpoena the defendant's second wife to testify at trial, she could not be located, and the defendant refused to reveal her whereabouts. *Id.* at 159, 25 L.Ed. at 248. The district court found that the defendant had procured the witness's absence, and as a result, the prosecutor could put into evidence her testimony at a previous trial, notwithstanding the defendant's objection that such a procedure violated his constitutional right to confront the witnesses against him. *Id.* at 158–60, 25 L.Ed. at 247–48.

■ On appeal to the Supreme Court, the Court affirmed, holding that, although the Constitution grants a defendant "the privilege of being confronted with the witnesses against him[,] if he voluntarily keeps the witnesses away, he cannot insist on his privilege." *Id.* at 158, 25 L.Ed. at 247. The Court stated that this "rule has its foundation in the maxim that no one shall be permitted to take advantage of his own wrong." *Id.* at 159, 25 L.Ed. at 248; *accord United States v. Houlihan,* 92 F.3d 1271, 1279 (1st Cir.1996); *Balano,* 618 F.2d at 629.

We think this discussion supports the conclusion that the loss of a defendant's right to object is based on a forfeiture theory because the loss rests on the defendant's misconduct, not on the defendant's intentional relinquishment of a known right. *See Steele v. Taylor,* 684 F.2d 1193, 1201 n. 8 (6th Cir.1982) (noting that waiver principles are not applicable); *People v. Geraci,* 85 N.Y.2d 359, 625 N.Y.S.2d 469, 649 N.E.2d 817, 821 & n. 2 (1995) (same); *People v. Cotto,* 169 Misc.2d 194, 642 N.Y.S.2d 790, 793 (Sup.Ct.1996) (referring to rule that "one not be permitted to profit from one's own misconduct" as "the venerable common law concept of forfeiture by misconduct"); *see also United States v. White,* 116 F.3d 903, 911–12 (D.C.Cir.1997) (holding that a defendant may *forfeit* his confrontation rights by misconduct). With this basic understanding, we now discuss the governing legal principles.

■ B. *Applicable legal principles.* In *Reynolds,* the Supreme Court held that the question of wrongful procurement is one of fact and therefore must be determined prior to the admission of secondary evidence. 98 U.S. at 159, 25 L.Ed. at 248; *accord Balano,* 618 F.2d at 629 (stating that "the judge must hold an evidentiary hearing in the absence of the jury"). The State bears the burden to prove that the defendant has wrongfully procured the witness's unavailability. *See Pappalardo,* 576 N.Y.S.2d at 1003. Although the defendant asks us to require proof by clear and convincing evidence, we align Iowa with the majority of jurisdictions that require

proof only by a preponderance of the evidence. *See United States v. Emery,* 186 F.3d 921, 927 (8th Cir.1999) (noting that the majority of federal courts of appeal have required proof by a preponderance of the evidence); *White,* 116 F.3d at 911–12 (same); *see also Steele,* 684 F.2d at 1201 (holding that preponderance-of-the-evidence standard "is constitutionally sufficient under the due process and confrontation clauses"). We now turn to the specific showing that is required.

■ The general rule of forfeiture is based on the defendant's wrongful conduct or misconduct. Although these terms on their face arguably imply the necessity for some illegality in the defendant's actions, the case law does not support such a restrictive interpretation. Misconduct sufficient to give rise to a forfeiture is not limited to the use of threats, force or intimidation. *See Steele,* 684 F.2d at 1202. "[I]t has also been held to include persuasion and control by a defendant, the wrongful nondisclosure of information, and a defendant's direction to a witness to exercise the fifth amendment privilege." *Id.* at 1201, 1203 (finding that defendants had procured witness's unavailability when one of the defendants had used "his influence and control over [the witness] to induce her not to testify"); *accord Pappalardo,* 576 N.Y.S.2d at 1004 ("As the cases in this area demonstrate, the specific method used by a defendant to keep a witness from testifying is not determinative."); *see also Reynolds,* 98 U.S. at 160, 25 L.Ed. at 248 (finding loss of right to object on basis that defendant failed to reveal the location of the witness, his wife).

The broad scope of conduct that may give rise to a forfeiture is consistent with the philosophy underlying the forfeiture rule:

> The theory of the cases appears to be that the disclosure of relevant information at a public trial is a paramount

interest, and any significant interference with that interest, other than by exercising a legal right to object at the trial itself, is a wrongful act.

*Steele,* 684 F.2d at 1201; *see generally United States v. Carlson,* 547 F.2d 1346, 1359 (8th Cir.1976) ("Nor should the law permit an accused to subvert a criminal prosecution by causing witnesses not to testify at trial who have, at the pretrial stage, disclosed information which is inculpatory as to the accused."). Thus, it is the fact that a defendant's conduct interferes with the interest in having witnesses testify at a public trial that makes the defendant's conduct wrongful. As a result, the nature of the defendant's conduct is not as important as the effect of that conduct on the witness's willingness to testify at trial.

■ When a court finds that a defendant has procured a witness's unavailability, the defendant is precluded from asserting his constitutional right to confront the witnesses against him as a basis to prevent the admission of prior statements given by the witness. *See Emery,* 186 F.3d at 926; *Steele,* 684 F.2d at 1202. Hearsay objections are also forfeited. *See White,* 116 F.3d at 912; *United States v. Thevis,* 665 F.2d 616, 632–33 (5th Cir.1982); *Devonshire v. United States,* 691 A.2d 165, 169 (D.C.Ct.App.1997).

■ C. *Application of legal principles to facts of this case.* As noted earlier the State submitted correspondence between the defendant and Medina to support its claim that the defendant had procured Medina's unavailability. The first letter upon which the State relied was written by the defendant to Medina after Medina was incarcerated for refusing to testify in the defendant's case. The defendant advised his brother to "hang in there.... [Y]ou only have two months left."[1] He told his brother, "Any judge with any respect for the law would not allow [the tape of Medi-

---

1. At the time of this letter, the defendant's trial was scheduled to start in two months. The defendant testified at trial that he under-

stood once his trial was over, Medina would be released from jail.

na's statement] to be used." He continued, saying that Medina should "calm down" and "not discuss anything of any importance over these f------ phones."[2]

The second letter put in the record by the State was written by Medina to the defendant eleven months later. In this letter, Medina begged the defendant to accept the State's plea offer, telling the defendant that he (Medina) "just can't handle it anymore." Medina implied that he was going to break down and testify if the defendant chooses to go to trial.[3] (At the time Medina wrote this letter, he had been incarcerated for fourteen months for his refusal to testify in his brother's trial.) Medina testified at the hearing on the State's pretrial motion that, at the time he wrote to the defendant, his girlfriend and

baby had left him. He said he would have done anything to get them back, including testifying in his brother's case. He admitted that he was apologizing to his brother in the letter for the possibility that he would testify. Medina stated in his testimony, without elaboration, that, as it turned out, it was not necessary for him to take this action.

The district court made the following findings with respect to the State's allegation that the defendant had influenced Medina not to testify:

> Although the [letter from the defendant to Medina] does not explicitly ask Medina to refrain from giving testimony, the court finds that this is the meaning of the quoted passage.[4] At the time he received the letter, Medina was incar-

---

2. The defendant's letter was written in response to a note that Medina had written to the defendant. The complete text of the relevant portion of the defendant's letter follows:

> Hey babe, what's up? Are you alright? Hope so. All I can say to you is hang in there. I know this jail sucks but you only got 2 months left. Consider yourself a short. A short-timer. That I know. The idea you were kicking around on the phone with your winyan [woman] is not a wise move. Reason being, you would only make the wasicu [white man] seem more credible. So they would in turn get you 5 years and me all day. Just kick back, relax, read some more books, eat your commissary and wait. Its not likely they will be able to use the tape anyway. The federal law case that the DA is trying to use to support his use of that tape is weak. It has absolutely nothing in common with police using illegally obtained evidence from a minor. Any judge with any respect for the law would not allow it to be used. So calm down and do not discuss anything of any importance over these f------ phones.

The defendant went on in the letter to talk about some copies of Native American songs that belonged to the defendant, but that Medina had in his possession. (The defendant and Medina are Native Americans.) The defendant told Medina that he had decided to let Medina keep the songs. He also discussed his and Medina's changed feelings toward Native Americans from other tribes and the defendant expressed his approval of Medina's newfound tolerance of other tribes. He concluded with the closing, "Love ya bro."

3. The full text of Medina's letter to the defendant follows:

> Well, I am not in "D" block no longer. They moved me to "I" block. Same old things go on in here as in the last block. I know that you heard about Antonite's ex and my ex. Boy, it hurts me so much. I just want to crawl into the earth and die. I am in a major, major depression as of yesterday. I'm sorry Matt, but I won't be able to handle another trial with all of this going on and on my mind. I am really, really sorry but if you don't take that thing I will have to do what I have to do. I'm really sorry, believe me because I am. I just can't keep going through all of this any longer. At first it was thinking about this case and Anthony. Thinking about that police interview, also about the time leading up to trial, and about that girl who died. It was driving me crazy, then Anthony got sick and then I lost him and now all of this. I just can't handle it anymore. If you went to trial I couldn't handle it, to [sic] much on my mind. I'm sorry Matt, but I am just telling you what I am going to do. Please forgive me for all of this. But my heart and spirit hurts so much. Please, I am begging you to take that thing, I don't want to see you get life or anything like that. If you don't understand I'm sorry, but deep down I know that you do. This is all I ask you, please take that. Don't do this because I can't take it anymore. I'm sorry.

4. The passage to which the court refers is the portion of the defendant's letter to Medina quoted in footnote 2 above.

cerated for his refusal to testify in the defendant's case. By asking Medina to "kick back, relax ..., and wait" and by instructing him not to "discuss anything of importance" over the phones, the defendant is clearly instructing Medina not to testify or make any statements which could be used at the defendant's trial.

The court further finds that the defendant's influence, as demonstrated in the letter, has caused Medina's continued silence. Another letter written by Medina to the defendant indicates Medina at one point was on the verge of testifying in spite of the defendant's wishes. The fact Medina is apologetic, and the fact that he wrote to the defendant on the subject is evidence of the defendant's influence. Although Medina stated at the hearing that he would not testify even if requested by the defendant, the court does not find this statement to be credible. Medina's testimony would not subject him to further criminal proceedings, and there is no reason to believe he would refuse a sincere request by the defendant to testify.

We agree with the trial court's findings. It is naive to think that the defendant was not encouraging his brother to persist in his refusal to testify when the defendant told Medina to "hang in there" and, in the same paragraph, reassures him that the judge would not let the tape of Medina's statement into evidence, "[s]o calm down." We also agree with the trial court's assessment that Medina's later letter to his brother showed that Medina was influenced by the defendant and was concerned about how the defendant would feel about Medina if Medina broke down and testified. Although Medina denied that the defendant influenced Medina's decision not to testify, we agree with the trial court's conclusion that this testimony was not credible, particularly in view of Medina's letter to the defendant.[5]

### IV. Conclusion and Disposition.

We hold that the defendant procured Medina's unavailability as a witness at trial by encouraging and influencing Medina not to testify. As a consequence, the defendant forfeited his right to object to the admission of Medina's videotaped statement. This *forfeiture encompassed any hearsay objections as well as objections based on the defendant's confrontation rights.* Therefore, the trial court properly admitted Medina's statement.[6] This ruling

---

5. The defendant's testimony at trial also supports the conclusion that he had influenced his brother not to testify. During cross-examination, the State asked the defendant about a letter he had written to his mother (who was also Medina's mother) shortly after he and his brother were arrested. The defendant stated in that letter, "My lawyer said not to let [Medina] testify against me at court .... Because if [Medina and I] get tried separately they won't be able to use anything he said against me unless he testifies in person." The defendant admitted at trial that this letter was "an instruction to [his] mother telling [his] mother not to let [his] brother testify against [him] in court."

6. Although the defendant has not specifically relied on the Due Process Clause, *see* U.S. Const. amend. V, as a basis to prevent admission of Medina's statement, some courts have included such an analysis as a prerequisite to the admission of an out-of-court statement even though the defendant has forfeited his right to object on hearsay or confrontation

grounds. *See e.g., Carlson,* 547 F.2d at 1360 n. 14 (noting that loss of confrontation rights by misconduct does not avoid due process fairness requirements); *State v. Keeton,* 573 N.W.2d 378, 382 (Minn.Ct.App. 1997), *overruled on other grounds by State v. Keeton,* 589 N.W.2d 85 (Minn. 1998) (same). *But see White,* 116 F.3d at 913 (rejecting argument that reliability of statements must be established prior to admission where defendant has forfeited confrontation rights). Although we question whether such an inquiry is necessary, we nonetheless conclude that the Due Process Clause poses no obstacle to admission of Medina's statement. A defendant's due process rights are not violated when corroborative evidence indicates that the out-of-court statement was not "totally lacking" in reliability. *See Thevis,* 665 F.2d at 633. This test is easily satisfied here by several items of corroborating evidence. The events leading to Rubottom's death occurred in the apartment of her friend, Justin Cloud. Cloud testified at trial that Medina and the defendant beat him and then tied his hands behind his

makes it unnecessary to reach the merits of the defendant's hearsay and confrontation objections to this evidence. We affirm the defendant's convictions.

**AFFIRMED.**

All justices concur except SNELL, J., who concurs in the result.

back with electrical cord. While Cloud "played dead," he could hear the brothers raping Rubottom and then he heard her gagging. A neighbor who encountered Cloud after Medina and the defendant left Cloud's apartment testified that when she saw Cloud, his hands were securely tied behind is back and his face was bruised and beaten. The defendant's fingerprints were found in the apartment, and an autopsy on the victim confirmed that she had been sexually assaulted (there was insufficient DNA material to identify the perpetrators), and had died of ligature strangulation. All of this evidence was consistent with the statement given by Medina. *See Hallum,* 585 N.W.2d at 252-53 (summarizing Medina's statement). Clearly his statement was not totally lacking in reliability so as to give rise to a due process violation.