923 A.2d 242 (2007)
393 N.J. Super. 218
STATE of New Jersey, Plaintiff-Respondent/Cross-Appellant,
v.
Dionte BYRD, Defendant-Appellant/Cross-Respondent.
State of New Jersey, Plaintiff-Respondent/Cross-Appellant,
v.
Freddie Dean, Jr., Defendant-Appellant/Cross-Respondent.
Superior Court of New Jersey, Appellate Division.
Submitted March 6, 2007.
Decided May 22, 2007.
*244 Andrew F. Schneider, attorney for appellant/cross-respondent Dionte Byrd.
Yvonne Smith Segars, Public Defender, attorney for appellant/cross-respondent Freddie Dean, Jr., (William Welaj, Designated Counsel, of counsel and on the brief).
Stuart Rabner, Attorney General, attorney for respondent/cross-appellant State of New Jersey (Daniel I. Bornstein, Deputy Attorney General, of counsel and on the brief).
Before Judges AXELRAD, R.B. COLEMAN and GILROY.
The opinion of the court was delivered by
GILROY, J.A.D.
The question presented is whether the trial court properly allowed introduction of an inculpatory out-of-court statement of a witness who refused to testify because defendants had threatened him with bodily harm if he testified against them. The answer requires an analysis of a defendant's right of confrontation under the Sixth Amendment and whether the statement fits within one of the exceptions to the hearsay rule of preclusion, or is admissible by other law. Because, unlike Fed.R.Evid. 804(b)(6), our Rules of Evidence do not contain a forfeiture-by-wrongdoing exception to the hearsay rule permitting admission of such a statement, we reverse.
These two appeals, calendared back-to-back,[1] arise from an indictment returned by a Mercer County Grand Jury on March 22, 2002. Following a jury trial, both defendants were found guilty of aggravated manslaughter (lesser-included offense of first-degree murder) (Count One); first-degree armed robbery, N.J.S.A. 2C:15-1 and 2C:2-6 (Count Two), and felony murder, N.J.S.A. 2C:11-3a(3) and 2C:2-6 (Count Three). Defendant Dean was also found guilty of second-degree possession of a weapon (handgun) for an unlawful purpose, N.J.S.A. 2C:39-4a and 2C:2-6 (Count Four), and third-degree unlawful possession of a handgun without a permit, N.J.S.A. 2C:39-5b and 2C:6-2 (Count Six). Byrd was also found guilty of second-degree possession of a weapon (shotgun) for an unlawful purpose, N.J.S.A. 2C:39-4a and 2C:2-6 (Count Five) and third-degree unlawful possession of a loaded shotgun, N.J.S.A. 2C:39-5c(2) and 2C:2-6 (Count Seven).
On October 29, 2004, both defendants were sentenced. As to Byrd, Counts One and Two were merged with Count Three, and Count Seven was merged with Count Five. On Count Three, defendant was sentenced to life imprisonment with thirty years' parole ineligibility, and on Count Five, he was sentenced to a concurrent ten-year term with five years' parole ineligibility. As to Dean, Counts One and Two were merged with Count Three, and Count Six was merged with Count Four. Like Byrd, Dean was sentenced to life imprisonment on Count Three with thirty years' parole ineligibility and a concurrent ten-year term, with five years' parole ineligibility, on Count Four. All appropriate fees and penalties were also imposed. Defendants appeal, and the State cross-appeals.
*245 On appeal, defendants present numerous arguments for our consideration. Among them, defendants argue that the trial judge erred in admitting the inculpatory statement of Kenneth Bush, a non-testifying State witness, depriving them of the right of confrontation and in violation of the Rules of Evidence. Because we agree that the judge erred in admitting the inculpatory statement, we reverse all convictions; remand for a new trial; and do not address the remaining issues raised by either defendants or the State.
The facts pertaining to the admission of the hearsay statement are as follows. At approximately 9:20 p.m. on August 26, 2001, Clinton Fudge; his friend Charlie Blackshear; his roommate Charles "Minnesota" Simmons, a known drug dealer; and Simmons' girlfriend, Catherine Cruser, were in Simmons' and Fudge's apartment in Trenton. Simmons and Cruser were in the back of the apartment, while Fudge and Blackshear were in the front of the apartment.
After hearing a knock at the door, Fudge glanced out the peephole and saw a man with his head down. He then heard a voice say, "Mini, Mini, Mini," and concluding that the visitor was there for Simmons, opened the door. Two men in their mid-twenties immediately pushed their way into the apartment. The taller of the two was armed with a gun, which Fudge believed was a shotgun, and ordered Fudge to get down on the floor.
As the shorter perpetrator began looking for other persons in the apartment, Simmons burst out from the rear of the apartment and backed the taller man into a corner. Fudge got up and assisted Simmons as he struggled with the armed intruder, causing the gun to go off three times without hitting anyone. The weapon discharged one final time and hit Simmons, who staggered down an interior hallway and fell face down.[2]
Officer Joseph Mondello of the Trenton Police Department was the first to arrive at the scene. Fudge met him in the hallway and advised the officer that Simmons had been shot. Upon entering the apartment, Mondello observed that it was in total disarray, with blood on the walls. Simmons, who was dead, was lying face down on the floor in an internal hallway of the apartment. Mondello retrieved two nine-millimeter shell casings from the interior hallway and another two from an adjacent room.
On August 27, 2001, Trenton Police Detectives Anthony Manzo and John Zappley proceeded to the Sleepy Hollow Motel and spoke to Stephen Robinson and Melissa Fink. These individuals suggested that the officers speak with Kenneth McNeil. After McNeil was brought to police headquarters for questioning regarding some unrelated robberies, he was interviewed by Zappley.
McNeil told Zappley that, a week prior to Simmons's death, he, along with defendant Dean and Kenneth Bush, had robbed Simmons. The three had driven to Simmons' apartment in McNeil's van where he and Bush got out, leaving Dean inside. McNeil lured Simmons out of his apartment and into the hallway. Bush then joined the pair and displayed a sawed-off shotgun he had received from Dean. McNeil told Simmons that he wanted money and crack cocaine. After Simmons gave them the items, McNeil and Bush left to smoke the crack with Dean.
*246 McNeil further related that he, Bush and Dean attempted to rob Simmons again a day or two later. The plan was for McNeil to get Simmons to open his door so that the other two could barge in and rob Simmons. Dean was again armed with the sawed-off shotgun. Simmons, however, failed to answer the door, and the three left.
According to McNeil, on August 26, he and Bush were at the Sleepy Hollow Motel getting high with drugs he had received after loaning his van to a known drug dealer. The drug dealer returned to the motel at 8:00 p.m. with Dean. McNeil recalled that Dean was acting crazy and aggressive, shouting, "I don't care who gets in my way," and "if I have to, I'll take somebody down." The four then took the van to drop the drug dealer off and took Dean to pick up a handgun. After Dean returned to the van, he demanded that McNeil loan him the van. When McNeil declined, Dean showed him the butt of a handgun that was stuck in his pants and stated that if McNeil stood in his way, he would kill him. At this point, Bush intervened, and they dropped Dean off without incident. McNeil and Bush then returned to the Sleepy Hollow Motel.
On August 29, 2001, an anonymous caller advised Manzo that "Hassan" and "Alim" were possibly involved in Simmons' homicide. At 6:30 a.m. on September 4, 2001, Manzo arrested Kenneth Bush, a/k/a "Alim Sprull," at his Trenton residence on unrelated charges. At the police station, Manzo advised Bush that they wanted to talk to him about Simmons' homicide and obtained his signature on a Miranda[3] waiver.
In his transcribed, written statement, Bush related that he had spent most of August 26 smoking crack with McNeil at the Sleepy Hollow Hotel while another drug dealer borrowed McNeil's van. At approximately 8:00 p.m., the drug dealer returned with his brother and Dean. Dean pulled up his shirt and showed Bush and McNeil that he had a nine-millimeter handgun.
Bush and McNeil subsequently drove the drug dealer, the drug dealer's brother, and Dean back to their respective residences, after which they returned to the motel to smoke more crack. When the crack was gone, Bush borrowed McNeil's van to go to Trenton to buy some more. Once in Trenton, he ran into Hassan Wilson, who asked if he could use the van in return for some crack. Bush agreed and let Wilson drive the van while he moved to the back of the van to smoke the crack. Wilson picked up Byrd and Dean and drove to Church Street where the two defendants got out. After about five or ten minutes, Byrd and Dean came running back to the van. Byrd was in obvious pain and said, "[t]he stupid motherfucker shot me." Bush glanced over at Dean and saw that he had the gun from the motel in his hand, with the slide open, "as if he had shot all the bullets in it."
Bush recalled that when Byrd again accused Dean of shooting him, Dean replied, "somebody came out with a gun and they were shooting too." Dean also stated, "man, I put it in him. I let off on him." Byrd replied, "man, you were just busting off. You were shooting real crazy." When Byrd stated that he had not seen anyone else with a gun when wrestling with "Minnesota," Dean insisted that "somebody had a shotgun in there, you got hit with a pellet." Wilson drove to Dean's cousin's house on West State Street, where his cousin helped clean Byrd's leg.
*247 While Bush was standing in the kitchen watching the proceedings, he noticed a sawed-off shotgun sitting on the counter next to the refrigerator. Byrd kept insisting that Dean had shot him. Finally, Dean grabbed Byrd's shotgun to see if he had shot himself, but the gun was fully loaded. After Byrd's leg was bandaged, the four returned to the van and drove to Dean's house. Bush stated that Wilson asked Dean for his gun, but that Dean refused to give it to him.[4] After giving his statement, Bush identified photographs of both defendants.

I.
Defendants contend that the lower court committed reversible error in admitting Bush's out of court statement. We agree.
Early in the trial, the prosecutor advised the court that it did not appear that Bush was going to testify. The prosecutor explained that Bush had become unnerved after being transported to court the prior week in a van with Byrd. On July 7, 2004, the prosecutor related that Bush was in the courthouse but had again expressed his unwillingness to testify. The prosecutor proposed holding a hearing outside the presence of the jury on the matter, and the court agreed. Thereafter, Bush refused to take the stand, refused to be sworn, and stated that he was not going to testify without offering any reasons why.
Following a recess, the prosecutor advised the court that Bush still refused to testify and asked that he be held in contempt. At the ensuing contempt hearing, Bush explained his reasons for not testifying as follows:
Well, there was some things that was made known to [Detective] LaBelle and [the prosecutor], I don't know if they made it known to you, situations that I have been put in and be continuing to be put in these situations would bring harm to myself and maybe my family as well. So, I mean, you know from day one, I was put in position where I was incarcerated with both these individuals. Then down the road I was placed again in another position with another one of these individuals. So, I mean, there is some other issues that go on. So, I mean, I can't keep putting myself in jeopardy as well as to, I mean, I understand things have to be taken care of, but, you know, I'm still alive. I have to have worry about that, you know.
At sidebar, the judge observed that Bush's explanation for his conduct comported with the prosecutor's previous disclosures and reflected reasonable concerns. The judge stated that he did not know what else could be done to secure Bush's testimony, aside from providing him with protective treatment, because Bush's existing incarceration rendered the court's contempt powers meaningless. The prosecutor advised the court that he had offered to have Bush moved to a different jail, but Bush had declined. The judge instructed the prosecutor to attempt to speak with Bush once again.
The next day, the judge confirmed that there would be "no practical effect of legitimate purpose" in holding Bush in contempt. The prosecutor, relying upon N.J.R.E. 804(a), requested the court hold a hearing in order to determine the precise *248 nature of the threats against Bush and to decide whether Bush was "unavailable" as a result of those threats. Although the judge refused, he expressed a willingness to reconsider if the prosecutor was able to support his request with legal authority.
Several days later, the prosecutor informed the judge that Bush wanted to speak with him regarding the manner in which he had been threatened and his reasons for not testifying. The prosecutor stated that Bush wanted to discuss a threatening letter Dean had sent to him, the threats he had received from both Dean and Byrd when they were on the same tier at the workhouse, and the threats Byrd had made during the van trip from Southwoods prison. The prosecutor, relying upon State v. Sheppard, 197 N.J.Super. 411, 484 A.2d 1330 (Law Div. 1984), asserted that, after hearing Bush's testimony, if the judge determined that the threats were valid, the judge could admit Bush's statement without requiring him to testify.
In response, counsel for Byrd requested that he be given an opportunity to question Bush. The judge denied the request, proposing to pursue the matter himself, in camera. Both defense counsels objected to the judge interviewing Bush off the record and outside the presence of counsel. Because the judge believed he would obtain a more "legitimate" reaction from Bush if the interview were conducted privately, he decided to interview Bush ex parte in camera that afternoon with only his law clerk, three sheriff's officers, and the court reporter in attendance. A transcript was made available to counsel the following day.
During the in camera interview, Bush acknowledged that his original statement to police was truthful. He then described several encounters he had had with defendants since giving that statement. Specifically, Bush related that in late 2001, he was incarcerated in the county jail and was briefly housed on the same tier as Byrd. He had a "tense" encounter with Byrd, during which time Byrd suggested that Bush could get bailed out if he changed his testimony. Bush claimed that he was fearful as a result of this meeting. A few weeks later, Dean was also housed in the same tier as Bush. On one occasion, Dean indirectly suggested that if "someone" were to testify against him, "something" might happen. Bush claimed that he lived on the same tier with Dean for approximately one year, and that Dean pressured him on a daily basis. Dean made it clear that he was not happy with Bush's proposed testimony and that he would not take kindly to Bush testifying against him. Bush claimed that he ultimately prepared his first affidavit disclaiming his statement because he could not deal with having to live with Dean under those circumstances and he needed to protect himself.
In December 2002, Byrd's brother, who was also incarcerated with Bush, showed Bush a letter from Byrd, wherein Byrd stated that Bush "could be got at." Bush understood this to mean that he was at risk of physical harm if he maintained his position against Byrd. Thereafter, in July 2003, Bush received a letter from Dean. According to Bush, this letter said that anyone who testified against Dean could "be dealt with." Bush subsequently encountered Byrd in a police van while being transported to court. Although the atmosphere in the van was tense, Byrd did not say anything to him. Bush also saw Dean shortly thereafter when he was placed in a cell opposite Bush's. Dean asked him what he was going to do about the case, but Bush did not reply.
Bush acknowledged that he had been angry with Manzo and Zappley for leaving him in close proximity to Dean and Byrd. *249 He claimed that the two detectives had promised to transfer him to a safer location. Bush wondered whether these repeated encounters with defendants had been deliberately arranged. He maintained that he was unwilling to testify out of fear for his own safety and the safety of his family.
The day after the judge's in camera interview with Bush, the prosecutor produced the letter from Dean. The court and counsel then engaged in an extended argument regarding the propriety of the court's actions. The prosecutor argued that, by threatening Bush, defendants had waived their right to confront him. Counsel for Byrd argued that the in camera procedure violated his client's right of due process, noting that, not only had there been no cross-examination, but the court also had asked leading questions. Although the judge agreed that the procedure was novel, with little case law to provide support, he was of the opinion that "no examination or cross-examination was possible given the attitude of the witness."
The judge stated that he was clearly convinced of the legitimacy of Bush's expressed concerns about testifying. He confirmed his ruling the next day and announced that he intended to admit Bush's statement following a reliability hearing. Thereafter, at the conclusion of the hearing, during which Manzo testified that Bush was not under the influence of either drugs or alcohol at the time he gave his statement, and that the statement was otherwise freely given and signed, the judge permitted Detective Manzo to read Bush's statement to the jury.

II.
Defendants argue that the trial judge erred in admitting the inculpatory statement of Bush who did not testify at trial. Defendants contend that they were deprived of their Sixth Amendment right to confront and cross-examine the accusing witness. Crawford v. Washington, 541 U.S. 36, 53-54, 124 S.Ct. 1354, 1365-66, 158 L.Ed.2d 177, 194 (2004); Chambers v. Mississippi, 410 U.S. 284, 294-95, 93 S.Ct. 1038, 1046, 35 L.Ed.2d 297, 308 (1973). In addition, defendants also assert that there is no exception to the hearsay rule, N.J.R.E. 801 to 808, authorizing the admission of the statement. The State counters that the trial judge properly admitted Bush's statement to the police as substantive evidence, prohibiting defendants from profiting from their criminal behavior. The State contends that defendants had forfeited their Sixth Amendment right to confront Bush when they procured Bush's silence by threatening him with bodily harm. The State asserts that because defendants forfeited their right to confront Bush that, a fortiori, they also waived their hearsay objection to the introduction of the statement. We disagree.
Generally, when the State moves to introduce an inculpatory, out-of-court statement of a non-testifying witness, the court must be satisfied that the statement does not violate the defendant's right of confrontation under the Sixth Amendment, Crawford, supra, 541 U.S. at 53-54, 124 S.Ct. at 1365-66, 158 L.Ed.2d at 194, and that the statement fits within one of the exceptions to the hearsay rule of preclusion, or is admissible by other law. N.J.R.E. 802.
A defendant's right to confront witnesses against him or her is guaranteed by both the Federal and New Jersey Constitutions. State v. Budis, 125 N.J. 519, 530, 593 A.2d 784 (1991) (citing U.S. Const. amend. VI; N.J. Const. art. 1, ¶ 10). This right of confrontation affords a defendant the opportunity to question the State's witnesses, protects against *250 improper restrictions on the questions asked during cross-examination, and affords the accused the right to elicit favorable testimony on cross-examination. Id. at 530-31, 593 A.2d 784. In furtherance of the right of confrontation, the United States Supreme Court in Crawford, supra, 541 U.S. at 53-54, 124 S.Ct. at 1365, 158 L.Ed.2d at 194, held that the Sixth Amendment proscribes "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." As to what falls within the category of testimonial evidence, the Supreme Court recently stated that such statements "are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." Davis v. Washington, 547 U.S. ___, ___, 126 S.Ct. 2266, 2273-74, 165 L.Ed.2d 224, 237 (2006).
Here, Bush's statement provided to the police during an interrogation constitutes testimonial evidence. Ibid. In most instances, that would end the discussion with the court prohibiting the introduction of Bush's statement. However, a defendant may forfeit his or her right to confrontation by "procuring or coercing silence from witnesses and victims." Davis, supra, 547 U.S. at ___, 126 S.Ct. at 2280, 165 L.Ed.2d at 244.
While defendants have no duty to assist the State in proving their guilt, they do have the duty to refrain from acting in ways that destroy the integrity of the criminal-trial system. We reiterate what we said in Crawford: that "the rule of forfeiture by wrongdoing ... extinguishes confrontation claims on essentially equitable grounds."
[Ibid. (quoting Crawford, supra, 541 U.S. at 62, 124 S.Ct. at 1371, 158 L.Ed.2d at 199).]
"That is, the one who obtains the absence of a witness by wrongdoing forfeits the constitutional right to confrontation." Ibid. The exception is commonly referred to as the "Rule of Forfeiture by Wrongdoing." Crawford, supra, 541 U.S. at 62, 124 S.Ct. at 1371, 158 L.Ed.2d at 199.
The State argues that the defendants forfeited their Sixth Amendment right of confrontation by threatening Bush with physical harm should he testify against them. Defendants challenge that proposition, contending the ex parte interview of Bush in camera, again deprived them of their Sixth Amendment right of confrontation. We agree. State v. Budis, supra, 125 N.J. at 530, 593 A.2d 784. The ex parte procedure employed here was at variance with the full evidentiary hearings conducted outside the presence of the jury in forfeiture-by-wrongdoing cases. See United States v. Cherry, 217 F.3d 811, 815 (10th Cir.2000); United States v. White, 116 F.3d 903, 911-14 (D.C.Cir.), cert denied, 522 U.S. 960, 118 S.Ct. 390, 139 L.Ed.2d 305 (1997); United States v. Balano, 618 F.2d 624, 629 (10th Cir.1979), cert. denied, 449 U.S. 840, 101 S.Ct. 118, 66 L.Ed.2d 47 (1980). However, we do not rest our decision in this matter on that determination alone.
In addition to determining whether the introduction of an out-of-court testimonial statement by a non-testifying witness violates a defendant's right to confrontation, the court must also be satisfied that introduction of the statement is authorized pursuant to an exception to the hearsay rule or by other law. N.J.R.E. 802. We conclude that it was not.
N.J.R.E. 804 governs hearsay exceptions where the declarant is unavailable to testify. "Unavailable" is defined in the rule as: *251 "Except when the declarant's unavailability has been procured or wrongfully caused by the proponent of declarant's statement for the purpose of preventing declarant from attending or testifying, a declarant is `unavailable' as a witness if declarant: ... (2) persists in refusing to testify concerning the subject matter of the statement despite an order of the court to do so[5]...." (N.J.R.E. 804(a) (emphasis added)). Because the State, the proponent of Bush's out-of-court statement, was not the party who wrongfully caused Bush not to testify, Bush was "unavailable" to testify as contemplated by the rule. However, the rule, contrary to the Federal Rules of Evidence, does not contain an exception to the hearsay rule, permitting admission of the statement. N.J.R.E. 804(b).
In 1997, the Federal Rules of Evidence were amended to include Fed.R.Evid. 804(b)(6), which provides:
(b) Hearsay exceptions. The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:... (6) Forfeiture by wrongdoing. A statement offered against a party that has engaged or acquiesced in wrongdoing that was intended to, and did, procure the unavailability of the declarant as a witness.
As explained in the Advisory Committee Notes to the 1997 amendments, this new hearsay exception was "added to provide that a party forfeits the right to object on hearsay grounds to the admission of a declarant's prior statement when the party's deliberate wrongdoing or acquiescence therein procures the unavailability of the declarant as a witness." Fed.R.Evid. 804(b)(6) advisory committee's note (1997). The Advisory Committee observed that Rule 804(b)(6) "recognizes the need for a prophylactic rule to deal with abhorrent behavior which strikes at the heart of the system of justice itself." Ibid.
Since the adoption of Fed.R.Evid. 804(b)(6), the highest courts in a number of states without a comparable codified hearsay exception have adopted the forfeiture doctrine through judicial decision. See, e.g., Devonshire v. United States, 691 A.2d 165, 168-69 (D.C.), cert. denied, 520 U.S. 1247, 117 S.Ct. 1859, 137 L.Ed.2d 1060 (1997); State v. Hallum, 606 N.W.2d 351, 354-56 (Iowa 2000); Commonwealth v. Edwards, 444 Mass. 526, 830 N.E.2d 158, 165-68 (2005). Several state intermediate appellate courts have also adopted the doctrine. See, e.g., People v. Moore, 117 P.3d 1, 5 (Colo.Ct.App.2004); State v. Henry, 76 Conn.App. 515, 820 A.2d 1076, 1089-90, appeal denied, 264 Conn. 908, 826 A.2d 178 (Conn.2003); People v. Melchor, 362 Ill.App.3d 335, 299 Ill.Dec. 8, 841 N.E.2d 420, 429 (2005), appeal granted, 218 Ill.2d 551, 303 Ill.Dec. 6, 850 N.E.2d 811 (2006). Notably, in State v. Henry, supra, 820 A.2d at 1090, the court drew support for its action from a "savings clause" incorporated into the Connecticut evidence code that allowed for the recognition of other evidentiary rules consistent with the code provisions.
Although N.J.R.E. 102 provides that "[t]he adoption of these rules shall not bar the growth and development of the law of evidence to the end that the truth may be ascertained and proceedings justly determined," we are satisfied that given the significant and far-reaching implications of this proposed hearsay exception, such a change in the Rules of Evidence should be accomplished by our Supreme Court in accordance with the procedure prescribed in N.J.S.A. 2A:84A-38 and -39, rather than by judicial opinion. See State v. Guenther, 181 N.J. 129, 160, 854 A.2d 308 (2004) (where significant changes to the *252 Rules of Evidence are proposed, they should be adopted in accordance with the procedure proscribed by statute). See also State v. D.R. 109 N.J. 348, 375-76, 537 A.2d 667 (1988) (refusing to adopt by judicial decision a rule providing for the admissible out-of-court statements by juvenile victims of sexual abuse). Accordingly, because N.J.R.E. 804(b) does not permit the State to introduce an inculpatory statement from a witness who refuses to testify because of threats to his or her safety made by the defendant, the trial court should not have permitted Detective Manzo to testify as to Bush's out-of-court statement.
The State argues that we should judicially adopt the hearsay exception codified in Fed.R.Evid. 804(b)(6) because the introduction of Bush's statement "abide[s] by the long-established common law rule that a defendant who procures a witness's silence through threats, intimidation or coercion forfeits the protections provided by the confrontation clause and the hearsay rule," citing White, supra, 116 F.3d at 912; United States v. Houlihan, 92 F.3d 1271, 1282 (1st Cir.1996), cert. denied, 519 U.S. 1118, 117 S.Ct. 963, 136 L.Ed.2d 849 (1997); United States v. Aguiar, 975 F.2d 45, 47 (2d Cir.1992); United States v. Mastrangelo, 693 F.2d 269, 272 (2d Cir.1982). Again, because of the far-reaching nature of the principle proposed, we reject the invitation in favor of the statutory mechanism for the adoption of additional rules of evidence. N.J.S.A. 2A:84A-33 to -39; State v. D.R., supra, 109 N.J. at 375-76, 537 A.2d 667. Because we are satisfied that Bush's out-of-court inculpatory statement should not have been introduced, we are constrained to reverse.
Reversed and remanded for a new trial.
NOTES
[1] We consolidated the appeals for purposes of this opinion.
[2] The medical examiner, Dr. Raafat Ahmad, testified that Simmons had been shot at close contact in the left upper chest or left shoulder area by a gun, not a shotgun, with the bullet exiting Simmons' body at the left lower back.
[3] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[4] Bush subsequently prepared two affidavits wherein he stated that he was high at the time he spoke to police and that he was coerced by police into signing a fabricated statement. However, according to Detective Frank LaBelle of the Trenton Police Department, Bush later admitted to him that the affidavits were false and prepared in retaliation against Manzo and Zappley for not giving him a better deal in an unrelated matter. Bush acknowledged that his original statement was truthful.
[5] Although the record does not disclose that Bush was ever ordered to testify, the record is clear that he would have refused even if so ordered.