# IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

**Opinion Number:**_____

**Filing Date: January 8, 2018**

**NO.  S-1-SC-34798**

**STATE OF NEW MEXICO,**

Plaintiff-Petitioner,

v.

**JOSHUA MAESTAS,**

Defendant-Respondent.

**ORIGINAL PROCEEDING ON CERTIORARI**
**Reed S. Sheppard, District Judge**

Hector H. Balderas, Attorney General
Joel K. Jacobsen, Assistant Attorney General
Santa Fe, NM

for Petitioner


León Felipe Encinias
Albuquerque, NM

for Respondent

**OPINION**

**MAES, Justice.**

{1} In prior cases we have determined that while a defendant has the constitutional right to confrontation, that right may be forfeited as a result of his own wrongdoing. In this case we determine whether wrongdoing requires an overt threat of harm to procure a witness's silence or absence. When the State's witness, Juliana Barela, Defendant Joshua Maestas's girlfriend, refused to testify at trial, the district court declared her unavailable. The State then requested that the district court find that Defendant had obtained Barela's unavailability by wrongdoing, and to therefore admit at trial testimony Barela gave to the grand jury, a statement she made to police, and a call she made to 911 operators. In support of its claim that Defendant had procured and intended to procure Barela's unavailability by way of misconduct, the State offered recorded jailhouse phone conversations between Defendant and Barela. The district court determined that Defendant had neither caused nor intended to cause by any wrongdoing Barela's decision not to testify, concluded Barela's prior statements were thus inadmissible, and dismissed Defendant's indictment. The State appealed. The Court of Appeals affirmed the district court's ruling. *See State v. Maestas*, No. 31,666, mem. op. ¶¶ 1, 20 (N.M. Ct. App. Jun. 3, 2014) (nonprecedential).

{2}     The State appealed to this Court pursuant to Rule 12-502 NMRA, which governs petitions for review of a decision by the Court of Appeals. We granted certiorari. We hold that wrongdoing, for purposes of the forfeiture-by-wrongdoing exception, need not take the form of overt threat of harm; various forms of coercion, persuasion, and control may satisfy the requirement. Accordingly, we reverse the decisions of the district court and Court of Appeals and remand to the district court to apply the forfeiture-by-wrongdoing exception, which we clarify today.

## I.     BACKGROUND

{3}     Following the altercation with Defendant, Barela received treatment for a concussion at Presbyterian Medical Center and her doctor reported a domestic incident to the police. While at the hospital, Deputy Metzgar of the Bernalillo County Sheriff's Department recorded his interview with Barela, who alleged that on December 2, 2009, Defendant had physically abused her and then threatened to kill her if he went to jail. Barela also completed a written statement. Barela later testified before a grand jury as a witness for the State. The grand jury returned an indictment charging Defendant with aggravated battery against a household member pursuant to NMSA 1978, Section 30-3-16 (2008); intimidation of a witness pursuant to NMSA 1978, Section 30-24-3(A)(3) (1997); child abuse pursuant to NMSA 1978, Section

2

30-6-1(D) (2009); battery against a household member pursuant to NMSA 1978, Section 30-3-15 (2008); and assault against a household member pursuant to NMSA 1978, Section 30-3-12 (1995).

{4} At Defendant's arraignment on January 4, 2010, his probation officer recommended that the district court increase Defendant's bond because Defendant was "an extreme risk to the victim." The probation officer added that at the time of his arrest in this case, Defendant was on supervised release for failing to comply with conditions of release for a separate misdemeanor domestic battery, for which Barela was also the alleged victim. The State expressed concern "about the continued ongoing violence." The district court, concerned that Defendant had acquired a new charge while he was under court-ordered supervision, increased Defendant's bond from $25,000 to $50,000. At the end of the hearing, Defendant acknowledged he was not to have any contact with Barela as a condition of his release.

{5} On February 26, 2010, the district court heard Defendant's motion to review his conditions of release. Defendant asked that his bond be reduced to $25,000 cash or surety with release to a third-party custodian—his aunt or to other relatives in Las Vegas. The State argued in response that bond had already been increased to $50,000 based on a finding that Defendant was a danger to Barela and the community. The

3

State added that Defendant had intimidated and threatened Barela on other occasions as well and reported that a separate criminal matter was pending, stemming from an August 29, 2009, incident wherein Defendant had continually called and harassed Barela, threatening to shoot her. The State also raised that Barela also believed that Defendant's family members had been following her by car on January 2 and January 6, 2010. The district court lowered Defendant's bond to $25,000 and ordered Defendant released pre-trial to the Las Vegas relatives. Again, at the conclusion of the hearing, Defendant acknowledged the court's order not to "have any contact in any manner whatsoever with [Barela]." Barela was present at the hearing.

{6} On April 6, 2010, the district court held a hearing on a new motion Defendant had filed seeking review of his conditions of release. Defendant asked the district court to change his third-party custodian to his aunt and to reduce his bond. The State argued the $25,000 bond set by the district court was reasonable based on Defendant's lengthy history of domestic violence; he had been arrested seven times for domestic violence between 2003 and 2009. Barela was again present at the hearing. The district court denied Defendant's motion to reduce his bond, finding $25,000 was reasonable under the circumstances. The district court allowed Defendant to be released into the custody of his aunt under a continuing order that

Defendant "have . . . no contact whatsoever" with Barela.

{7}     On April 30, 2010, the parties stipulated to a stay of the proceedings pending a determination of Defendant's competency.  At later hearings, the district court determined Defendant was not competent to stand trial and was dangerous to himself and others.  The district court thus stayed the proceedings and ordered Defendant committed for evaluation and treatment to attain competency. *See* NMSA 1978, § 31-9-1.2 (1999).  Defendant remained under the supervision of his aunt pending transportation for treatment to attain competency.

{8}     On November 3, 2010, the day after a hearing to determine Defendant's dangerousness, the State filed an emergency motion for reconsideration of Defendant's conditions of release.  The State alleged that Defendant, angry at the outcome of the dangerousness hearing, called and drove to the home of Barela's mother's boyfriend and threatened Barela's mother with a drive-by shooting.  By the time police arrived at the home, the State alleged, Defendant had fled the scene.  The district court convened a hearing to reconsider Defendant's conditions of release. Defense counsel was present and stated that he had attempted to contact Defendant, had communicated with Defendant's family, and was told Defendant had not returned home.  Defense counsel indicated he was not waiving Defendant's presence at the

hearing. In response, the State expressed concern that Defendant had allegedly carried a handgun when he threatened Barela's mother with a drive-by shooting, and the State thus asked that Defendant be held in custody until he could be transported for treatment to attain competency. Based on the State's allegations, the district court issued a bench warrant for Defendant's arrest and ordered a no-bond hold. Defendant was arrested later that day and held at the Bernalillo Country Metropolitan Detention Center.

{9} From November 10, 2010, through January 6, 2011, Barela contributed money to Defendant's detention center phone account. Partly because of those contributions, they remained in frequent contact, exchanging a total of 588 phone calls over that period.

{10} On May 5, 2011, Barela filed a notarized affidavit of nonprosecution that she had signed without her own counsel in Defendant's attorney's office, indicating that her statement to the police had been made "under pressure from the police and was written in error"; that on or about December 2, 2009, Defendant "did not intimidate [her] or threaten [her] to keep [her] from reporting the incident of December 2, 2009 to the police"; and that Defendant "did not threaten [her] or cause [her] to believe [she] was in danger of receiving an immediate battery." Then on July 1, 2011, in

6

response to a subpoena to appear at an interview at the district attorney's office, Barela appeared with her counsel, who instructed Barela not to give a statement at the pre-trial interview. The State filed a motion to compel Barela's testimony. The district court held a hearing on the motion on September 2, 2011, and Barela was placed under oath. The State asked, "Ms. Barela, can you tell me what occurred on December 2nd of 2009 involving the defendant, Mr. Joshua Maestas?" At that point, Barela's counsel asserted Barela's Fifth Amendment right not to testify.

{11}     After the hearing, the State filed a motion in limine requesting that the district court declare Barela unavailable and find that her prior statements were admissible under the doctrine of forfeiture by wrongdoing. The State contended Defendant had repeatedly called Barela from the jail, instructed her to lie for him and recant her statements, and intended to and did cause Barela's assertion of her Fifth Amendment right, rendering her unavailable to testify against him. In a written response, Defendant did not deny the content of the calls but described them as "puffing" and "not relevant to the issue of whether actions by [Defendant] caused Barela to make the affidavit[] which resulted in her asserting her privilege and ultimately in her unavailability." Defendant added he was not sophisticated enough, based on intelligence test scores, to devise that kind of plan. Furthermore, Defendant

7

contended, Barela continued to place money on Defendant's jail account for phone calls, Barela and Defendant had "genuine feelings for each other," and Barela had recanted because she simply "wanted to right a wrong."

{12} On September 26, 2011, during a hearing on pending motions, the State asked the district court to "declare [Barela] unavailable" and stated its intention to then argue for admission of her prior statements based on a claim Defendant had forfeited his confrontation right by wrongdoing. Defendant argued that Barela's May 5, 2011, affidavit of nonprosecution "essentially recant[ed]" both her statement to the police and her grand jury testimony and accordingly had waived her Fifth Amendment right under Rule 11-511 NMRA.

{13} After discussion of whether Barela had been informed of the consequences of making voluntary statements and whether she had waived her Fifth Amendment right under Rule 11-511, the district court found Defendant's counsel had no obligation to counsel Barela before she signed the notarized affidavit in his office. The district court granted the State's request to find Barela unavailable because of her assertion of her Fifth Amendment right.

{14} The State then sought to introduce evidence of Barela's cooperation with the prosecution prior to Defendant's threatening phone calls in support of its claim of

Defendant's forfeiture of his confrontation right by wrongdoing. The evidence included (1) the recording of the 911 call concerning the December 2, 2009 domestic abuse, (2) a belt tape recording of Barela's statements to the officer at the hospital, (3) the written statement Barela authored as part of the police investigation of Defendant's case, and (4) the transcript of Barela's testimony to the grand jury. The district court considered all but the 911 call, concluding the call was "not relevant" for purposes of evaluating the application of the doctrine of forfeiture by wrongdoing.

{15} The State also sought to establish Defendant's forfeiture by introducing evidence of his threats to Barela and her mother. This evidence included a CD containing the 588 phone calls—totaling more than 55 hours—that Barela had with Defendant while he was in jail and a recording of a 911 call Barela's mother had made in response to Defendant's threat that he would conduct a drive-by shooting. The district court held that any alleged threats to Barela's mother were irrelevant for purposes of evaluating Defendant's forfeiture by wrongdoing.

{16} The district judge indicated that while he had not been provided transcripts, he had been provided the CD of the jail telephone call recordings at a prior hearing. He stated

> [t]he Court has spent over an hour listening to phone calls. That's a very good representative sample of the total of almost 56 hours of phone

9

calls. I listened to ten in a row and I just selectively skipped through and listened to primarily the longer calls.

After that review, the district judge noted (1) Barela had added the money to Defendant's detention center phone account "to enable those calls to be made in the first place," (2) the language used on the calls was "atrocious," (3) Barela had often supported Defendant's dislike for her mother, and (4) Barela and Defendant typically said "I love you, babe" to each other at the end of each call. Based in part on those findings,

> The [c]ourt found no threats and have not been pointed to any threats by the State to the effect that, "Juliana, if you don't come in and take the Fifth or file a nonaffidavit, nonprosecution affidavit or go to Mr. Encinias' office to file an affidavit, I'm going to kill or hurt your mother." That's not the essence of these phone calls at all that I have reviewed. I'm not going to listen to 55 hours of phone calls.

{17} The district court added that "no single call has been pointed out to the Court wherein [a nonprosecution affidavit is] the subject of the conversation. . . . I found no threats that under the Forfeiture by Wrongdoing Doctrine would indicate that [Defendant] has done anything—and this is very important—with the intent to keep . . . Barela from testifying." The district court emphasized that Defendant "says all these things he's going to do if he gets out, but it's not in the context of trying to prevent her from testifying. . . . These are two people that apparently have very strong

feelings for one another . . . ." And, the district court observed, on the occasion when Defendant threatened to "blow[] up" Barela's mother's house, the conversation "had no contextual setting that he was doing that to threaten . . . Barela that if she came in to court and testified then he was going to blow up her mother's house."

{18} Based on those conclusions, the district court determined that although Barela was unavailable, the State had failed to prove Defendant caused Barela's unavailability and had failed to prove Defendant intended to prevent Barela from testifying. The district court therefore denied the State's motion to admit Barela's prior statements. And based on the State's position that it could not proceed to trial without Barela's statements, the district court entered an order dismissing Defendant's charges on October 3, 2011.

{19} The State appealed. The Court of Appeals affirmed the district court's ruling. *See Maestas*, No. 31,666, mem. op. ¶ 1. The State sought further review in this Court, pursuant to Rule 12-502 (governing petitions for the issuance of a writ of certiorari). We granted certiorari to review the sole issue of "[w]hether the doctrine of forfeiture by wrongdoing requires an overt threat of harm in addition to other conduct designed to procure a witness's silence or absence."

II. STANDARD OF REVIEW

11

{20}    The State argues that because the facts are undisputed and this case requires review of "the scope of the doctrine of forfeiture by wrongdoing" and "admissibility under the Confrontation Clause," de novo review is appropriate. Defendant argues in response that the true issue concerns the district court's factual determination that Defendant did not cause Barela's unavailability and therefore a review for abuse of discretion is appropriate.

{21}    We generally review evidentiary matters for an abuse of discretion. *State v. Montoya*, 2014-NMSC-032, ¶ 15, 333 P.3d 935. "This standard of review, however, is different when a defendant's evidentiary challenge is based on constitutional rights to confrontation." *Id.* "[Q]uestions of admissibility under the Confrontation Clause are questions of law, which we review de novo." *Id.* ¶ 16 (quoting *State v. Aquilino Lopez*, 2013-NMSC-047, ¶ 7, 314 P.3d 236 (citation omitted)); *State v. Attaway*, 1994-NMSC-011, ¶ 10, 117 N.M. 141, 870 P.2d 103, (explaining that when "the relevant legal principle can be given meaning only through its application to the particular circumstances of a case," the "appellate court is reluctant to give the trier of fact's conclusions presumptive force and, in so doing, strip . . . [an] appellate court of its primary function as an expositor of law" (internal quotation marks and citation omitted) *holding modified on other grounds by State v. Richard Lopez*,

2005-NMSC-018, 138 N.M. 9, 116 P.3d 80); *see also United States v. Henderson*, 626 F.3d 326, 333 (6th Cir. 2010); *United States v. Townley*, 472 F.3d 1267, 1271 (10th Cir. 2007).

**III.    DISCUSSION**

{22}    Criminal defendants are guaranteed the constitutional right to confront the witnesses to be used against them at trial.  *See* U.S. Const. amend. VI; N.M. Const. art. II, § 14.  The confrontation right is robust, subject to just a few founding-era exceptions.  *Crawford v. Washington*, 541 U.S. 36, 54 (2004).  One of those exceptions arises when a defendant engages in certain forms of wrongdoing; and in these scenarios, the United States Supreme Court has often observed, the defendant may forfeit the confrontation right.  *See, e.g.*, *Reynolds v. United States*, 98 U.S. 145, 158 (1878); *see also Giles v. California*, 554 U.S. 353 (2008).

{23}    We first considered in New Mexico the contours of the forfeiture-by-wrongdoing exception in *State v. Alvarez-Lopez*, a case where a defendant had absconded after indictment and remained a fugitive for seven years so as to avoid trial and potential incarceration.  *See Alvarez-Lopez*, 2004-NMSC-030, ¶¶ 6-7, 136 N.M. 309, 98 P.3d 699.  A key witness had been deported in the interim and was thus unavailable to testify when the defendant was eventually tried; had the trial happened

sooner, unavailability may not have been an issue. *Id.* The state asked us to conclude, given those facts, that the defendant had forfeited his constitutional right to confront the witness. *Id.*

{24} Examining the scope of the exception, we looked first to the common-law history. *Id.* ¶ 8. We noted the federal courts had long concluded that a defendant may forfeit his confrontation right by wrongdoing on the reasoning that even the constitutional right will not allow an actor to benefit from "his own wrong." *See id.* (quoting *United States v. Mastrangelo*, 693 F.2d 269, 272 (2d Cir. 1982) (internal quotation marks omitted)). And reflecting that widespread application, we observed, the Federal Rules of Evidence had been amended in 1997 to add a hearsay exception codifying the forfeiture doctrine as applied by the courts at the time. *Alvarez-Lopez*, 2004-NMSC-030, ¶ 9. The result of that codification was Federal Rule of Evidence 804(b)(6) (Rule 804(b)(6)), which permitted introduction at trial of certain hearsay statements, like Barela's statements at issue here, when the "statement [wa]s offered against a party that has engaged or acquiesced in wrongdoing that was intended to, and did, procure the unavailability of the declarant as a witness." *Alvarez-Lopez*, 2004-NMSC-030, ¶ 9 (quoting Rule 804(b)(6) (internal quotation marks omitted)). The language of Rule 804(b)(6) has since been modified slightly. It now allows

admission of statements "against a party that wrongfully caused—or acquiesced in wrongfully causing" unavailability, where the party does "so intending that result." Rule 804(b)(6).

{25}     Although we had not adopted a Rule 804(b)(6) analog at the time, we observed in *Alvarez-Lopez* that we are compelled to grant defendants at least as much protection as the federal rule, derived as it is from the constitutional requirement of confrontation. *Alvarez-Lopez*, 2004-NMSC-030, ¶ 9. And thus hewing closely to the language of Rule 804(b)(6), we held each of the following conditions must be met before forfeiture may be found: (1) a declarant was expected to be a witness, (2) the declarant became unavailable, (3) the defendant's misconduct caused the unavailability of the declarant, and (4) the defendant intended by his misconduct to prevent the declarant from testifying. *Id.* ¶ 10. And, we emphasized, unavailability resulting only in some "attenuated" way from wrongdoing will not render the forfeiture exception applicable. *Id.* ¶ 12. Instead, the exception applies only when a defendant actually intends to procure, and does procure, the unavailability of the witness by his wrongdoing. *Id.* ¶ 14. It is the state's burden, we added, to establish each of those conditions by a preponderance of the evidence. *Id.* ¶ 10.

{26}     We were asked to revisit the forfeiture exception a few years later and to

15

address the question of whether Rule 804(d)(6) and the derivative test we had adopted compels a broader forfeiture exception more closely aligned with the constitutional provisions. *See State v. Romero*, 2007-NMSC-013, ¶ 28, 141 N.M. 403, 156 P.3d 694. That might be the case, we recognized in *Romero*, for reasons of policy, or it might be the case were we willing to embrace and explore a distinction between *waiver* and *forfeiture* of the confrontation right. *Id.* But we found neither analytic avenue supported broader application of the forfeiture exception—both the Supreme Court case law and principles of policy dictate that the constitutional confrontation right applies broadly and the corresponding forfeiture exception applies narrowly and carefully, and only in cases in which "intentional wrongdoing" justifies "an equitable conclusion of forfeiture." *Id.* ¶ 34 (highlighting the "important public policy of deterring intentional wrongdoing that threatens the strength of the process in which the constitutional right operates"). *Alvarez-Lopez*, we held, continued to set the standard for forfeiture of the confrontation right by wrongdoing. *Id.* ¶ 37.

{27} Our *Alvarez-Lopez* and *Romero* analyses gained further support a year later when the United States Supreme Court recognized the common-law forfeiture exception's codification in the federal rule and added that the constitutional confrontation right must apply as broadly as we had recognized in *Romero*. *See*

16

*Giles*, 554 U.S. at 367 (emphasizing the exception's intent requirement). And in 2011, given that widespread acceptance and application, we added in New Mexico an analog to the federal rule which embraced the four-condition test we had first set forth in *Alvarez-Lopez* for establishing forfeiture. *See* Rule 11-804(B)(5) NMRA. The *Alvarez-Lopez* conditions thus continue to reflect the requirements for establishing forfeiture of the confrontation right, and Defendant has given us no grounds for exploring additional state constitutional protection here that would narrow the forfeiture exception. As noted, the State bears the burden of establishing each condition by a preponderance of the evidence. *Alvarez-Lopez*, 2004-NMSC-030, ¶ 10.

{28}    We have in the past made reference to the forfeiture exception as both "rule" and "doctrine," reflecting its long history as a common-law doctrine and its more recent "codification" in the Federal Rules of Evidence. *See, e.g.*, *Alvarez-Lopez*, 2004-NMSC-030, ¶ 7 ("rule"); *see also Romero*, 2007-NMSC-013, ¶ 37 ("doctrine"); *accord Giles*, 554 U.S. at 367 ("We have described [Rule 804(b)(6)] as a rule which codifies the forfeiture doctrine." (internal quotation marks and citation omitted)). Because our focus here is on the scope of the exception to the constitutional right, our preferred descriptor is "forfeiture-by-wrongdoing exception." We have no occasion

to examine here any potential distinctions between a rule-based form of the exception and the common-law form.

{29} In this case, the first two *Alvarez-Lopez* conditions were satisfied: (1) The State included Barela in its witness list, and the district court subpoenaed her to testify; and (2) Barela "became unavailable" when she asserted her Fifth Amendment right and chose not to testify. The parties and the district court do not dispute those facts. The parties do dispute, however, whether the third and fourth *Alvarez-Lopez* conditions have been satisfied—they disagree as to whether Defendant caused by misconduct Barela's unavailability and whether he intended to procure her unavailability by that misconduct. The State argues that the Court of Appeals and the district court analyzed the forfeiture exception inappropriately by requiring a showing of proof of an overt threat of harm, and it advances the theory that the doctrine applies not only to threats of physical harm "but to any means of intentionally procuring a witness's absence." Defendant responds by arguing that the lower courts did not impose a requirement of specific or overt threat, but instead, in applying the *Alvarez-Lopez* conditions, appropriately concluded that the State failed to establish wrongdoing causing and intended to cause Barela's unavailability.

{30} The language of the district court's ruling does not cleanly reveal whether a

18

requirement of specific or overt threat was imposed. Defendant, we note, does not contend the district court *should* have imposed that requirement; both parties are apparently in agreement that both intent and causation may be established without a showing of specific or overt threat of harm. Instead, the dispute here requires resolution of related questions of what other kinds of conduct may constitute wrongdoing for purposes of establishing forfeiture, whether the conduct here sufficed, and whether the State's evidence established that the *Alvarez-Lopez* intent and causation requirements were met.

**A.     Wrongdoing Need Not Take the Form of Overt Threat of Harm**

{31}     Regarding the question of what conduct might constitute wrongdoing, we observe that nowhere in *Alvarez-Lopez* did we require an overt or specific threat of harm. *See generally Alvarez-Lopez*, 2004-NMSC-030.  We did briefly, if inconclusively, examine the boundaries of the wrongdoing concept in noting that where a defendant procures unavailability "by chicanery, by threats, or by actual violence or murder, the defendant cannot then assert his confrontation clause rights." *Alvarez-Lopez*, 2004-NMSC-030, ¶ 8 (quoting *Mastrangelo*, 693 F.2d at 272-73 (2d. Cir. 1982) (internal quotation marks omitted)).  That language, of course, suggests wrongdoing encompasses a variety of conduct, not all of which need constitute overt

19

or specific threat. We also observed that deterrence of witness intimidation is one of the "primary purposes" of the forfeiture exception, but we had no occasion then to enumerate the ways in which intimidation might occur. *Alvarez-Lopez*, 2004-NMSC-030, ¶ 14. In the end, we assumed that absconding—even without threat—might constitute the requisite wrongdoing; but the state's forfeiture claim turned more precisely, we explained, on the questions of whether by absconding the defendant had intended to cause, and did cause, the witness's unavailability. *See id.* ¶¶ 12-13. In *Romero*, we had no occasion to consider what kinds of conduct may give rise to application of the exception; we concluded only that murder of a witness may suffice assuming the other prerequisites, including intent, have been met. *See Romero*, 2007-NMSC-013, ¶¶ 30-31. We did note, however, the forfeiture exception's "equitable limitation on the right of confrontation" typically applies when a defendant seeks to undermine our judicial process "by procuring or coercing" the unavailability of the witness. *Id.* ¶ 29 (quoting *Davis v. Washington*, 547 U.S. 813, 833 (2006) (internal quotation marks omitted)). That language bore no hint of overt threat requirement; and as in *Alvarez-Lopez*, we reiterated in *Romero* that the emphasis in making the forfeiture determination is not typically on the wrongdoing itself but on the question of whether the wrongdoing was intended to cause, and did cause, unavailability. *Id.*

¶ 37.

{32}    The genesis and lengthy history of application of the forfeiture exception in federal and state case law and the exception's codification in the federal evidence rules suggest that cases from other jurisdictions may provide us additional guidance in delineating the scope of wrongdoing for purposes of forfeiture. Various courts have recognized the concepts of wrongdoing and misconduct might imply, at least superficially, a requirement of "some illegality in the defendant's actions," but they have been quick to note the great weight of case law cannot support such a restrictive understanding. *See, e.g.*, *State v. Hallum*, 606 N.W.2d 351, 356 (Iowa 2000); *see also United States v. Williams*, 443 F.3d 35, 46 (2d Cir. 2006) (noting wrongdoing "need not consist of a criminal act"); *accord People v. Pappalardo*, 576 N.Y.S.2d 1001, 1004 (N.Y. Sup. Ct. 1991) ("As the cases in this area demonstrate, the specific method used by a defendant to keep a witness from testifying is not determinative."). That reading is consistent with the advisory committee notes for Rule 804(b)(6), which explain that although "wrongdoing" is given no definition in the text of the rule, it "need not constitute a criminal act." Rule 804(b)(6) advisory committee's notes to 1997 amendment. Instead, generally any use of "coercion, undue influence, or pressure" may silence testimony and impede the truth-seeking function of trial, and

21

thus any pressure of that kind may interfere with the background interests giving rise to the exception. *United States v. Scott*, 284 F.3d 758, 764 (7th Cir. 2002); *Steele v. Taylor*, 684 F.2d 1193, 1201 (6th Cir. 1982). While wrongful conduct thus "obviously includes" force and threat, it may also include "persuasion and control" by the wrongdoer, certain nondisclosure of information, or a command that a witness "exercise the fifth amendment privilege." *Steele,* 684 F.2d at 1201; *Scott*, 284 F.3d at 763-64; *accord United States v. Dhinsa*, 243 F.3d 635, 653-54 (2d Cir. 2001) (noting wrongful conduct includes scenarios where "the defendant . . . was involved in, or responsible for, procuring the unavailability of the declarant 'through knowledge, complicity, planning or in any other way'" (citation omitted)).

{33} In examining wrongful conduct, we must be careful to distinguish between "affirmative action" designed to produce unavailability and "simple tolerance of, or failure to foil" a third party's own decision not to appear. But that distinction typically tells us more about the causation question than whether conduct may be characterized as wrongful. *See Leif Thurston Carlson v. Att'y Gen. of Cal.*, 791 F.3d 1003, 1010-11 (9th Cir. 2015). The rationale supporting the forfeiture exception suggests the background interest in disclosing relevant information at trial is "paramount," and "any significant interference with that interest" beyond the exercise

22

of legal rights provided the defendant by the trial or constitution may constitute wrongful conduct. *Hallum*, 606 N.W.2d at 356 (quoting *Steele*, 684 F.2d at 1201 (internal quotation marks omitted)); *accord United States v. Donald Laverne Carlson*, 547 F.2d 1346, 1359 (8th Cir.1976) ("Nor should the law permit an accused to subvert a criminal prosecution by causing witnesses not to testify at trial who have, at the pretrial stage, disclosed information which is inculpatory as to the accused."). Various forms of manipulation may satisfy that condition, and it may often be the case that the nature of the conduct is less important than the effect of the conduct on the witness's willingness or ability to testify at trial. *See United States v. Jonassen*, 759 F.3d 653, 662 (7th Cir. 2014); *Hallum*, 606 N.W.2d at 356 ("Misconduct sufficient to give rise to a forfeiture is not limited to the use of threats, force or intimidation."); *accord United States v. Mayes*, 512 F.2d 637, 650-51 (6th Cir. 1975) (finding wrongful conduct where counsel invoked witness's Fifth Amendment privilege for defendant's protection).

{34}    The weight of the case law both here and elsewhere is thus clear: wrongdoing, for purposes of application of the forfeiture exception, need not take the form of an overt threat of harm. As we noted explicitly in *Alvarez-Lopez* and *Romero*, chicanery, coercion, or intimidation may satisfy under the circumstances. *See Alvarez-Lopez*,

23

2004-NMSC-030, ¶ 8; *see also Romero*, 2007-NMSC-013, ¶ 29. In many cases, the basic question to be answered—in cases where it may be appropriately separated from the causation and intent questions—is simply whether the defendant has actively applied pressure by persuasion, coercion, intimidation, or otherwise, that may interfere with a witness's availability or willingness to testify. *See, e.g., Commonwealth v. Edwards*, 830 N.E.2d 158, 170-71 (Mass. 2005) (noting forfeiture may turn on collusion if defendant "contributed to the witness's unavailability in some significant manner"); *accord Jonassen*, 759 F.3d at 662 (highlighting "tactics rang[ing] from pleas for sympathy to bribes"). Accordingly, application of the forfeiture-by-wrongdoing exception requires no showing of overt threat of harm; it applies to any conduct intended to interfere with or undermine the judicial process. A threat of physical harm may suffice, as may persuasion, intimidation, murder, or other violent conduct. Defendant's conduct here—in the form of repeated demands for Barela to change her story and various expressions of frustration and anger when she was not immediately compliant, preceding Barela's signing, uncounseled, the affidavit of nonprosecution in Defendant's attorney's office and her refusal to testify—clearly had the potential for persuasive and coercive effect and thus constituted wrongful conduct. Application of the exception, however, requires not

24

just wrongdoing but both intent to cause, and causation of, unavailability by that wrongdoing.

**B.** **Principles Guiding the Intent and Causation Determinations**

{35} To guide examination of the causation and intent questions on remand, we note the State offers two basic arguments in asking us to conclude both were established here. The State contends that inferences of both causation and intent may be drawn from recordings demonstrating Defendant's repeated demands that Barela recant or refuse to testify against him. The State adds that inferences of both causation and intent may be drawn from the history of domestic violence between Defendant and Barela. And, the State maintains, the district court and Court of Appeals erred in concluding that domestic violence evidence was irrelevant, in contravention of the *Giles* Court's teaching regarding the importance of that contextual evidence. In response, Defendant contends the district court correctly concluded that the State failed to prove by a preponderance of the evidence that he intended to cause and did cause Barela's unavailability. Instead, Defendant maintains, she voluntarily invoked her Fifth Amendment right.

{36} The district court may have been somewhat hamstrung in its review of these questions. While the State represented that a listing of the phone calls was attached

25

as an exhibit to a motion filed on September 2, 2011, the listing was not attached to the motion and does not appear in the record. And in a later hearing, the district court noted that it had not been provided with transcripts of the recordings. The listing and transcripts would clearly have aided the district court in its review. Nevertheless, the district court endeavored to listen to one hour of the more than fifty-six total hours of recorded phone calls, calling it "a very good representative sample." Having engaged in that review, the district court found that while Defendant made various remarks regarding Barela's mother, Barela did not seem threatened or upset based on her responses and even ended each conversation by saying, "I love you, babe." The purpose of these phone calls, the district court found, was not to threaten and thereby prevent Barela from testifying. Instead, the court explained, "He says all these things he's going to do if he gets out, but it's not in the context of trying to prevent her from testifying. It's just not."

**{37}** The Special Concurrence advocates restricting the district court's review on remand to two phone calls the State properly admitted into evidence at trial, to avoid allowing the State an undeserved second bite at the apple. We disagree because on remand the district court has discretion to decide whether to utilize all of the evidence in the record or a subset, perhaps as offered by the parties on remand. We have

reviewed the recordings of the calls between Defendant and Barela and identified some of the most relevant exchanges[1] in the following summary, which exemplify the types of information that may be used to address the elements of causation and intent.

{38} In one call Defendant demanded that Barela "better fucking put money on [her] phone or fucking do something," which she agreed to do. [CD 1288823715_313 at 12:59:59-13:00:01] In another call, he demanded: "You're going to get your dumb ass and go to fucking court tomorrow in the morning because I'm going back to fucking court, and you're going to tell them you're fucking lying, okay?" [CD 1288824162_324 at 12:57:26-31] Barela simply responded, "All right." [CD 1288824162_324 at 12:57:31-33] Defendant continued, "Since you fucking lie for everybody else, bitch, you're going to lie for me." As the call was cut off by the operator, Barela agreed to give Defendant more money. [CD 1288824162_324 at 12:57:34-50] On multiple occasions, he threatened Barela and her mother, telling Barela that "[Barela's mother is] going to be the next bitch missing in the mesa"; [CD 1288824923_326 at 12:59:25-29] "Your mom, I'm going to get out and fucking kill that bitch"; [CD 1288825413_326 at 12:55:53-55] and "Your mom better watch out.

---

[1]Because each call begins with the number 12888, each call we reference is identified by the last six digits (before the underscore) of the file name. The audio files do contain a time stamp, which has been included as a pinpoint reference.

That's all I gotta say . . . . I can't wait 'til I get out so I can blow up your fucking house sick . . . just blow it up off the fucking foundation." [CD 1288826312_326 at 12:56:22-52] On another occasion, he asked why Barela had yet to lie for him, and she interrupted him, exclaiming, "Okay! . . . I will, okay? All right? I will." [CD 1288826652_326 at 12:55:56-56:04] Later, he directed her to go to the district attorney "tomorrow . . . first thing" and tell them that she was lying about the incident because she had a lying problem. [CD 1288833219_326 at 12:57:02-25] And Barela replied, "Oh, yeah, I know that." [CD 1288833219_326 at 12:57:34-37] In a subsequent call, Defendant pleaded with Barela to "burn the DA, to just go in there and tell them that you're lying about everything . . . . I can get out probably . . . probably about a month if you make efforts to try and try and try to do it." [CD 1288982841_124 at 13:06:52-07:04] And Barela responded, "I've been. You should have seen me today." [CD 1288982841_124 at 13:07:04-07] But Defendant then changed his mind and instructed Barela to "call the judge's secretary," identifying the judge by name. [CD 1288982841_124 at 13:07:35-42] In a subsequent call, Defendant complained that Barela was not doing enough to help him. [CD 1288995187_123 at 13:04:47-51] Defendant reiterated that she could say she was lying; in response Barela asked, as she had previously, whether Defendant would

28

support her if he were released from jail. [CD 1288995187_123 at 13:05:10-40] Barela added that if she didn't want to help Defendant, she would not be "calling everybody" at his behest. [CD 1288995187_123 at 13:06:10-12] Defendant responded by lamenting, "I've been telling you to fucking call the DA since I first fucking came in here, haven't I?" [CD 1288995187_123 at 13:06:40-45] As the conversation heated up, Barela exclaimed that she'd "been calling [the DA], Josh! I talked to one of them. I have to talk to Susan! What part of that don't you fucking get?" [CD 1288995187_123 at 13:06:45-55] Defendant shouted angrily in response, "Call the fucking judge. Call the fucking judge. Call the fucking judge." [CD 1288995187_123 at 13:06:55-07:00] Barela began to cry in response and eventually told Defendant to find someone else to help him before ending the call abruptly. [CD 1288995187_123 at 13:07:01-38] And in another call, Defendant emphasized for Barela that he was "ready to fucking kill someone . . . . I'm tired of being fucking ratted on by bitches." Barela, crying, responded by imploring Defendant to stop calling if he continued to believe she had ratted on him. [CD 1288826550_326 at 12:59:12-30] And Barela's crying was hardly uncommon—she could frequently be heard crying at the end of their conversations.

**1. Causation**

{39} In determining whether the causation requirement has been satisfied in *Alvarez-Lopez*, we looked to the language of Rule 804(b)(6) for guidance, noting the language at that point required that a defendant "procure" unavailability by wrongdoing. *Alvarez-Lopez*, 2004-NMSC-030, ¶ 12. And although the language of the rule has since changed, substituting "cause" for "procure," the basic point of *Alvarez-Lopez* remains instructive: "indirect and attenuated" consequences will not satisfy the causation condition for purposes of forfeiture. *Id.* Even tort law's familiar "but-for" principle is not typically enough in these cases; other courts have explained something more like a "precipitating and substantial" cause may be required, *see United States v. Jackson*, 706 F.3d 264, 266-67 (4th Cir. 2013) (internal quotation marks and citation omitted), and even a determination that the wrongful conduct was "the real reason" for unavailability. *Scott*, 284 F.3d at 765.

{40} At the same time, however, causation need not be established by direct evidence or testimony; rarely will a witness who has been persuaded not to testify regarding an underlying crime come forward to testify about the persuasion. *See Scott*, 284 F.3d at 764 ("It seems almost certain that, in a case involving coercion or threats, a witness who refuses to testify at trial will not testify to the actions procuring his or her unavailability."); *State v. Weathers*, 724 S.E.2d 114, 117 (N.C. Ct. App.

30

2012) ("It would be nonsensical to require that a witness *testify against a defendant* in order to establish that the defendant has intimidated the witness into *not* testifying.") (emphasis in original). Instead, the question must often be resolved by inference. In cases involving long-term domestic relationships, various factors may support an inference that wrongdoing has caused unavailability. The Tenth Circuit Court of Appeals, for example, has upheld a trial court's application of the exception given a history of domestic violence and violations of a no-contact order between a defendant and the witness refusing to testify. *United States v. Montague*, 421 F.3d 1099, 1102-03 (10th Cir. 2005).

{41}     Courts have relied on indirect evidence of forfeiture by wrongdoing in additional contexts. *See People v. Jones*, 144 Cal. Rptr. 3d 571, 575-77 (Cal. Ct. App. 2012) (concluding forfeiture may be established based in part on the contents of threatening phone calls from jail wherein the unavailable witness, in the face of the threats, assured defendant that she "had his back"); *Roberson v. United States*, 961 A.2d 1092, 1097 (D.C. 2008) (concluding trial court could find co-conspirators had eliminated a witness when defendant, after his arrest, had spoken with conspirator "several times by telephone," had indicated shortly after the death of the witness that the conspirator had "taken care of" the witness, and had not countered the suggestion

at trial that the conspirator had killed the witness); *State v. Warner*, 116 So. 3d 811, 814-815, 818 (La. Ct. App. 2013) (upholding admission of testimonial statements under the forfeiture exception when witness had received anonymous threats to which defendant may have acquiesced and then refused to testify only after contact in jail with defendant). *Cf. People v. Burns*, 832 N.W.2d 738, 745 (Mich. 2013) (overturning a trial court's admission of victim's statements under the forfeiture exception while noting that the timing of wrongdoing is important and wrongdoing conducted after the filing of criminal charges may give rise to stronger inference of causation).

{42} In this case, the nature of the relationship between Barela and Defendant may have supported an inference of causation. *Giles*, 554 U.S. at 377; *Montague*, 421 F.3d at 1103-04. The timing and circumstances surrounding Barela's assertion of the Fifth Amendment right may have also supported the inference. *Warner*, 116 So. 3d at 817. And the nature of the many conversations they had while Defendant was detained may have supported an inference, particularly given the abandonment of the immunity petition and the unlikelihood that Barela's unavailability was instead motivated by her fear of a future perjury charge. On remand, application of these and related factors should guide the determination of whether the State has established by

a preponderance of the evidence that Defendant's misconduct caused Barela's unavailability and has thus satisfied *Alvarez-Lopez*'s causation requirement.

**2.      Intent**

{43}      For purposes of intent, we explained in *Alvarez-Lopez* that the party pressing the forfeiture exception need not show the wrongdoer was motivated solely by a desire to procure the witness's unavailability; instead, the proponent need only establish that the wrongdoer "was motivated *in part* by a desire" to procure the unavailability. *Alvarez-Lopez*, 2004-NMSC-030, ¶ 13 (quoting *Dhinsa*, 243 F.3d at 654 (internal quotation marks and citation omitted)); *see also Jackson*, 706 F.3d at 269 (noting forfeiture may be warranted even if actor has "multiple motivations"). The intent required is nevertheless a specific one, as the *Giles* Court explained; the exception only applies when the actor "has in mind the particular purpose of making the witness unavailable" by his conduct. *Giles*, 554 U.S. at 367 (internal quotation marks and citation omitted). And as is the case in many contexts, the proponent need not advance direct evidence of intent because it may suffice "to infer under certain facts" that the wrongdoer intended to prevent the witness from testifying. *Alvarez-Lopez*, 2004-NMSC-030, ¶ 13.

{44}      The U.S. Supreme Court has observed that a history of abuse in a relationship

provides additional "highly relevant" context for ascertaining intent. *Giles*, 554 U.S. at 377 ("Acts of domestic violence often are intended to dissuade a victim from resorting to outside help, and include conduct designed to prevent testimony to police officers or cooperation in criminal prosecutions. Where such an abusive relationship culminates in murder, the evidence may support a finding that the crime expressed the intent to isolate the victim and to stop her from reporting abuse to the authorities or cooperating with a criminal prosecution—rendering her prior statements admissible under the forfeiture doctrine."). *See also* Clifford S. Fishman, *Confrontation, Forfeiture, and* Giles v. California*: An Interim User's Guide*, 58 Cath. U. L. Rev. 703, 729 (2009) (concluding that a majority of the fractured opinions in *Giles* held that intent to thwart witness testimony could be inferred from a history of abuse). There may often, in other words, be little "reason to doubt that the element of intention would normally be satisfied by the intent" imputed to the "domestic abuser in the classic abusive relationship, which is meant to isolate the victim from outside help, including the aid of law enforcement and the judicial process." *Giles*, 554 U.S. at 380 (Souter, J., concurring in part).

{45} Many of the facts that support an inference of causation here could likewise support an inference of intent. The history of the abusive relationship and the various

34

threatening phone calls may themselves have "expressed" an "intent to isolate" Barela and to prevent her from cooperating with the prosecution. *Giles*, 554 U.S. at 377. The fact that Defendant repeatedly demanded that Barela lie for him and give the prosecution an account different from the one previously given may also support an inference that he intended to secure her unavailability. *See, e.g.*, *United States v. Aguiar*, 975 F.2d 45, 47-48 (2d Cir. 1992) (concluding defendant forfeited his confrontation right after he told witness how to testify and threatened witness and witness's family). The inference may have gained strength given the timing and nature of Defendant's calls and the timing of Barela's change of heart—regardless of whether, as the district court found, the calls may have also reflected shared love and strong feelings. *See, e.g.*, *People v. Smith*, 907 N.Y.S.2d 860, 861 (N.Y. App. Div. 2010) ("The power, control, domination and coercion exercised in abusive relationships can be expressed in terms of violence certainly, but [is] just as real in repeated calls sounding expressions of love and concern."). As with the causation inquiry, application of these and related principles should guide the determination of whether the State has established by a preponderance of the evidence that Defendant's misconduct was intended to cause Barela's unavailability and has thus satisfied *Alvarez-Lopez*'s intent requirement.

## IV.    CONCLUSION

{46}    Wrongdoing, for purposes of the forfeiture-by-wrongdoing exception, need not take the form of overt threat of harm; various forms of coercion, persuasion, and control may satisfy the requirement.   And the proponent of application of the exception may establish with the aid of inference that a wrongdoer intended to cause, and did cause, the unavailability of the subject witness.  We reverse the decision of the Court of Appeals and remand to the district court for further proceedings consistent with the principles set forth in this opinion.

{47}    **IT IS SO ORDERED.**

_____
**PETRA JIMENEZ MAES, Justice**

**WE CONCUR:**

_____
**JUDITH K. NAKAMURA, Chief Justice**

_____
**CHARLES W. DANIELS, Justice**

36

_____

**BARBARA J. VIGIL, Justice**

**EDWARD L. CHÁVEZ, Justice (concurring in part and dissenting in part)**

**CHÁVEZ, Justice (concurring in part, dissenting in part).**

{48}     I fully concur with the legal analysis of the forfeiture-by-wrongdoing exception.  If it was not already clear that wrongdoing, for purposes of the forfeiture-by-wrongdoing doctrine, does not require evidence of an overt threat of harm but can be proven with evidence of coercion, persuasion, and/or control, the majority opinion adds clarity.  However, I cannot agree with the decision of the majority to cite to evidence that was not presented to the trial court.  We should not interfere with the trial court's decision on remand by cataloging calls never considered by the trial court or mentioned by the State in the proceedings below.  Because the majority does so, I respectfully dissent.

{49}     The State offered no testimony in support of its written motion to have the trial court apply the forfeiture-by-wrongdoing doctrine.  The State simply cited generally to a "*CD of phone calls from [the] jail phone*" it attached to its motion.  The State did not select the calls it relied on to prove the elements of the doctrine.  The State did not provide the court with a transcript of the calls it relied on to prove the elements of the doctrine.  The State did not even cite to the court where on the CD the court could find the relevant calls.  The prosecutor even acknowledged that the problem with her motion was that she "didn't identify specific calls."  Yet the trial court allowed the

38

prosecutor to make a record. The prosecutor then described in general terms "two particular calls in the bundle of calls" she intended to play for the court, which she thought proved that Defendant's conduct indicated an intent to silence the witness. The State did not play the calls for the trial court. The State did not provide a transcript of the two calls. The State did not specify where on the CD the trial court could locate the calls.

{50} The CD contained 588 calls between Defendant and Barela, which took place over more than 55 hours. In an affront to standard practice, the State did not cite to any specific calls or locations within the CD that supported its motion or factual averments. The State also neglected to produce in the record on appeal an index of the calls which it claimed was attached to its motion. The majority opinion makes the polite understatement that "[t]he district court may have been somewhat hamstrung in its review of these questions" because of the State's factual presentation. *Maj. Op.* at ¶ 36.

{51} It is not the responsibility of either this Court or the trial court to search the record for evidence to support a claim or assertion. That responsibility belongs to the attorney. We usually do not disturb a trial court's findings when the substance of all pertinent evidence is not stated with proper citations to the transcripts or exhibits.

39

*See* Rule 12-318 NMRA; *Bank of N.Y. v. Romero*, 2011-NMCA-110, ¶ 8, 150 N.M. 769, 266 P.3d 638, *rev'd on other grounds*, 2014-NMSC-007, 320 P.3d 1. The following exchange between the trial court and the prosecutor during the September 26, 2011 hearing demonstrates why we should be reluctant to reverse the trial court based on the record below and to give the State a second bite at the apple.

THE COURT: The State's burden in this type of a proceeding is to prove that the defendant's conduct was with the intent to silence a witness; is that correct?

MS. CALLAWAY: Yes, Judge. But I think what the Court has to do, also, is not to necessarily silence the witness. I think that we have to interpret the word silence. Because in this case the defendant was encouraging the witness to come in and lie. And that's the information that's on the jail tape.

MS. CALLAWAY: So I'm asking the Court to listen to the jail calls. I'm not going to play 588 calls, but I have several calls that indicate what kind of conversations are being had with this witness. And I think it's important for the Court to hear that.

THE COURT: Well, the Court has been provided with no transcripts of the recordings. And, yet, the Court was provided with a DVD or CD of the jail calls some time ago at a prior hearing, and the Court has spent over an hour listening to phone calls. That's a very good representative sample of the total of almost 56 hours of phone calls. I listened to ten in a row and I just selectively skipped through and listened to primarily the longer calls.

The Court found no threats and have [sic] not been pointed to any threats by the State to the effect that, "Juliana, if you don't come in and take the Fifth or file a nonaffidavit, nonprosecution affidavit or go to

40

Mr. Encinias' office to file an affidavit, I'm going to kill or hurt your mother." That's not the essence of these phone calls at all that I have reviewed. I'm not going to listen to 55 hours of phone calls. But no single call has been pointed out to the Court wherein that's the subject of the conversation.

MS. CALLAWAY: May I make a record, Your Honor?

THE COURT: Yes, ma'am.

MS. CALLAWAY: Okay. Because my understanding that it is appealable.

At this point, Judge, I would just like to point out that there were two particular calls that I intended to play for the Court today. The Court may have listened to them. I don't know. I think part of the problem may be perhaps when I submitted my motion was I didn't identify specific calls. And with 588 calls I can imagine the Court had its hands full.

So there's two particular calls in the bundle of calls that I think do state what the Court is looking for. It does—the defendant does tell the witness that she will come to Court and lie for him. And so I don't know if the Court is willing to listen to those two particular calls. I know you've ruled, Judge, but there's two particular phone calls that would identify the threat to the victim.

I'm looking at the list of calls that I attached to the motion. In particular, No. 6, that particular call identifies the fact that the defendant is threatening to kill the victim's mother.

On No. 9, he threatens to blow up her house. . . .

So perhaps the State wasn't clear in its motion. I had submitted the CD of the phone calls, but I think that those two particular phone calls sum up the State's concern with the continued contact with the

41

victim. And so I don't know if the Court is willing to reconsider that.

{52} Ultimately the State pointed to phone call nos. 6 and 9, which as described in general terms by the State, concerned threats of violence against Barela's mother. Although the State asserted that there were calls where Defendant encouraged Barela to lie for him, the State never specifically identified such calls. The State asked for an opportunity to "make a record" after the trial court announced that it would not listen to 55 hours of calls, and the trial court granted the State permission. However, rather than playing those portions of the CD that the State considered to be pertinent, the State described the two calls in general terms. This effort to make an offer of proof was marginally adequate under Rule 11-103 NMRA. *See State v. White*, 1954-NMSC-050, ¶ 21, 58 N.M. 324, 270 P.2d 727 ("The basic reason underlying the rule of tender is directed at insuring exact knowledge on the part of the trial court of the evidentiary facts which he is called upon to admit into or exclude from consideration.").

{53} The State's appellate counsel did take the time to review the calls and cite this Court to specific portions of the CD that may support the State's argument. The trial court did not have the benefit of appellate counsel's professional work. The trial court rightfully refused to listen to all 55 hours of calls, and correctly afforded the

State an opportunity to specify which calls supported the State's argument. The State failed to take advantage of the opportunity. In my opinion it is inappropriate to catalog the calls we were alerted to on appeal for two reasons. One, it condones and therefore encourages the artless practice below with the expectation that appellate counsel will salvage the case. Two, it signals to the trial court how this court wants the trial court to decide the case on remand. Instead, we should leave it to the discretion of the trial court whether to reopen the case for additional evidence or simply consider calls 6 and 9 to determine whether the State met its burden under the legal analysis in the majority opinion.

{54}    However, the majority has opted to detail some of the calls it finds are "the most relevant exchanges...that may be used to address the elements of causation and intent." *Maj. Op.* at ¶ 37. Although I think it is wrong for the majority to detail and comment about these calls, *see id.* ¶¶ 38, 45, I have reproduced a portion of paragraph 38 of this Court's majority opinion as it was circulated for the votes of the Justices to illustrate an appropriate way for counsel to cite to voluminous recorded evidence.

> {38}    In one call Defendant demanded that Barela "better fucking put money on [her] phone or fucking do something," which she agreed to do. **[CD 1288823715_313 at 11:59:59-12:00:01]** In another call, he demanded: "You're going to get your dumb ass and go to fucking court tomorrow in the morning because I'm going back to fucking court, and you're going to tell them you're fucking lying, okay?" **[CD**

43

**1288824162_324 at 11:57:26-31]** Barela simply responded, "All right." **[CD 1288824162_324 at 11:57:31-33]** Defendant continued, "Since you fucking lie for everybody else, bitch, you're going to lie for me." As the call was cut off by the operator, Barela agreed to give Defendant more money. **[CD 1288824162_324 at 11:57:34-50]**

{55} The trial court sampled approximately one hour of the over 55 hours of calls. It is clear to me that the trial court did not find the calls that are summarized in paragraph 38 of the majority opinion. I am not sure that call nos. 6 and 9, which were relied on by the State, are within the calls the majority relies on to reverse the trial court. We should not go beyond the State's offer of proof. If we are not obligated to search the record for evidence to support a party's argument, I see no reason why a trial court must do so. Yet the circulating opinion reverses the trial court because the court did not search the CD for telephone calls between Defendant and Barela that would support the State's motion. Surely the State reviewed the CD of telephone calls. The State bears the burden of proving its case, and therefore it should have reviewed the CD of telephone calls and cited to the particular calls on which it was relying. The State could also have submitted a summary to prove the content of the voluminous CD. Rule 11-1006 NMRA. Instead, the State erroneously chose to impose this burden on the trial court. The shortcut taken by the State has resulted in years of prolonged appeals with others doing the work for the Second Judicial District

44

Attorney's office.

{56} Although I question the need for a rule that requires citation to specific portions of exhibits during motions practice, some districts have such a rule. For example, the First Judicial District Court's Local Rule LR1-305(B) NMRA, "[e]xhibits to motion, response, or reply," provides: "[o]nly relevant excerpts from affidavits or other documentary evidence shall be attached as exhibits. Pertinent portions shall be highlighted, underlined, or otherwise emphasized for the court's attention and on all copies." The same rule should apply to electronic evidence. Perhaps it is time to adopt a statewide rule mandating lawyers to do what should be an obvious best practice—cite specifically to the evidence that supports their case.

{57} In this case the State offered a general description of two phone calls for the trial court's consideration, which the trial court did not find adequate to support the State's motion. Whether the trial court will find that either or both calls satisfy the forfeiture-by-wrongdoing exception, which we clarify today, should be for the trial court to decide. Whether the trial court, in its discretion, will allow the State to tender additional evidence, should also be for the trial court to decide.

{58} I would remand to the trial court to apply the forfeiture-by-wrongdoing exception to the evidence presented to the court in the State's offer of proof.

45

Ordinarily a case is not remanded in order to afford a party an opportunity to supply missing evidence. *Rochez Bros., Inc. v. Rhoades*, 527 F.2d 891, 894 (3d Cir. 1975). An exception may occur when the missing evidence was the result of a misunderstanding by the court and the parties, or an ambiguity in the rules of procedure. *Id*. at 894-95. If the two calls are not adequate, I would allow the trial court to determine whether there is justification to allow the State to supply the missing evidence on remand. But I cannot agree to join my colleagues in an opinion that does the work for the prosecutor, because doing so condones and therefore encourages the artless practice that occurred in this case. For these reasons I respectfully dissent.

_____

**EDWARD L. CHÁVEZ, Justice**